## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

David Dominique,

                Plaintiff,       Case No. 18-cv-13777

v.                          Judith E. Levy
                          United States District Judge

United States of America,

                          Mag. Judge Elizabeth A. Stafford

                Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [20]

Before the Court is Defendant United States of America's motion for summary judgment. (ECF No. 20.) The motion is fully briefed. For the reasons set forth below, Defendant's motion is GRANTED.

### I.    Background

This Federal Tort Claims Act (FTCA) case arises from a March 23, 2015 encounter at the Patrick V. McNamara Federal Building in Detroit, Michigan, between Plaintiff David Dominique and several Federal Protective Service (FPS) agents. Plaintiff challenges the FPS agents' conduct and asserts claims against Defendant of false arrest

(Count I), false imprisonment (Count II), and intentional infliction of emotional distress (Count III). Defendant argues that it is entitled to summary judgment on Plaintiff's claims. Defendant also argues that it is entitled to governmental immunity. For the reasons that follow, the Court grants summary judgment to Defendant on part of Counts I and II and on all of Count III, and the Court finds that governmental immunity protects Defendant from liability on Plaintiff's remaining claims.

### A. Plaintiff's Employment History

Plaintiff worked at the McNamara Building as an investigator for Homeland Security Investigations (HSI) between 2003 and 2014.[1] (*See* ECF No. 20-2, PageID.112–113, 127.) HSI's offices are located on the eighteenth floor. (*See id.* at PageID.110.) Plaintiff spent his first seven years with HSI in its cyber group primarily handling child pornography and child exploitation cases but also "some financial cases." (*Id.* at PageID.127.) He requested a transfer and then spent two to two-and-one-half years working in HSI's national security group until he was

---

[1] Plaintiff indicates that "[o]n paper, I was originally hired by the U.S. Customs Service. While I was in training, they transitioned to ICE, and also later transitioned [to] Homeland Security Investigations." (ECF No. 20-2, PageID.127.)

terminated in 2014. (*See id.* at PageID.113, 127.) The reason given to Plaintiff for his termination was "[i]nability to perform my position as criminal investigator, and carry a weapon." (*Id.* at PageID.113.)

Plaintiff's investigator job with HSI was a law enforcement position. (*See id.*) He started working as a law enforcement officer in 1991. (*See id.* at PageID.126.) During his time in law enforcement, he received training "multiple times" in the use of force and in self-defense, and he also received training in "how to immobilize a suspect" and "training, legal training, as it pertains to stops and arrests." (*Id.* at PageID.127; *see id.* at PageID.120 (indicating that he received training "about what constitutes an arrest").)

Plaintiff testified that HSI wrongfully terminated his employment in early 2014 "for making [an] EEOC [Equal Employment Opportunity Commission] complaint" against the agency. (*Id.* at PageID.113, 115.) "Generally speaking," his allegations

> were harassment, sexual harassment, according to procedure, sexual orientation. Where—on numerous, numerous occasions, I was subjected to harassment, belittling, mobbing by others, at the office.

> And management was well aware of it, and they failed time,
> and time, and time again, to address the complaints, even
> saying if you don't like it, then quit, to me.

(*Id.* at PageID.116.) According to Plaintiff, his EEOC complaint was

denied, and various medical issues "precluded him from filing any

appeals." (ECF No. 22, PageID.217; *see* ECF No. 20-2, PageID.116.)

Plaintiff filed a civil lawsuit against HSI in federal court "based on

EEOC violations" and reached a settlement agreement with the agency

"on some of the issues" in 2014 or 2015. (ECF No. 20-2, PageID.116.)

Plaintiff started seeing a psychiatrist and a counselor "[r]oughly

about a year and a half before" his employment with HSI ended in 2014.

(*Id.* at PageID.114.) The psychiatrist diagnosed Plaintiff "with post

traumatic stress disorder, as relating to working child exploitation,

child pornography cases, and also due to the lack of support in the

workplace, by coworkers, and the ongoing harassment." (*Id.*) During his

deposition, Plaintiff indicated that he switched providers prior to his

departure from HSI and was still receiving treatment for "work related

trauma," panic, depression, anxiety, and "stress related issues." (*Id.* at

PageID.114–115.) In addition, Plaintiff voluntarily admitted himself to

inpatient treatment at Cittenden Hospital the day after his "gun and

4

badge [were] taken away" by Special Agent in Charge (SAC) William Hayes. (*Id.* at PageID.113, 115.) Plaintiff states that "[t]hat was the tipping point at which . . . emotionally, I had a breakdown." (*Id.* at PageID.115.)

Plaintiff has not worked since he left his position at HSI. (*See id.* at PageID.112–113.) In 2014, after he was terminated, Plaintiff applied for, and was granted, Social Security disability. (*See id.* at PageID.128.)

## B. The FPS Alert on Plaintiff Issued on January 29, 2014

On January 28, 2014, Inspector Robert J. McManus created an FPS Report. (*See* ECF No. 20-3, PageID.132–133.) The report's narrative section states:

> At approximately 1200 hours this date, I received notification from ADRD Kupser that HSI Deputy SAC William Hayes was reporting a possible threat. ADRD Kupser provided a photo and personal information pertaining to a suspect (Dominique) and I distributed the information to our Inspectors and to the G4S PSO supervision and staff with the instructions that the suspect was not to be allowed access into the building without under going [sic] the complete security screening process. ADRD Kupser stated at that time that I needed to contact Mr. Hayes at his office to obtain additional information.

* * *

5

I interviewed Mr. Hayes at approximately 1600 hours at which time I arranged for him to provide me with a photo and biographical information on the suspect. The meeting also revealed that his agency had recovered the suspect's law enforcement credentials and his weapon back in July of 2013 but that the suspect was still in possession of his HSPD-12 PIV card.[2] Mr. Hayes further stated that the suspect was pending additional personnel action(s).

My investigation also revealed that the suspect was recently observed in a local gun shop apparently shopping for firearms. While looking at the firearms, the suspect also allegedly made statements that were possibly threatening to HSI. The suspect has also allegedly made reference to the HSI shooting in Los Angeles, CA[,] which involved an HSI subordinate and supervisor.

I created an FPS Alert pertaining to the suspect which is being forwarded for review and approval.

(*Id.* at PageID.133.)

During his conversation with Hayes, McManus found Hayes credible. (*See* ECF No. 20-13, PageID.205.) Hayes provided information to McManus that indicated that "it was possible [Plaintiff] could be armed with a firearm," "it was possible that [Plaintiff] had expressed hostility toward HSI," and Hayes "was afraid [Plaintiff] could pose a threat" to the McNamara Building. (*Id.*) McManus indicates that

---

[2] McManus indicates that a PIV card is "the identification card that is used to get in" the building. (ECF No. 20-13, PageID.198.)

preventing workplace violence and preventing a possible workplace shooting are FPS's "top priorities." (*Id.* at PageID.206.) A possible workplace shooting in a government building is "of extreme concern" because "shootings are occurring everywhere, just constantly, and workplace violence is very prevalent." (*Id.* at PageID.205–206.)

> Regarding the information in the report, McManus testified that
>
> [i]t certainly didn't sound like [a favorable employment action had been taken with respect to Plaintiff]. They had taken away his duty weapon and his law enforcement credentials . . . .
>
> Employees at the McNamara Building come through. They show their identification. They go through a turnstile, which is activated by their I.D., and they go in without screening.
>
> They wanted that not to happen with him. They had concerns for their safety with [Plaintiff].

(*Id.* at PageID.198.) McManus adds that the information he received and "the fact that [HSI] had taken away his weapon and his law enforcement credentials, was indicative of a person they were concerned with possibly being violent." (*Id.*) McManus was asked during his deposition, "But you had no information of a specific plan?" To which he responded, "That's correct." (*Id.*) And when asked if there was "a concern about [Plaintiff's] psychological state," McManus responded: "I

7

don't know. I have no idea." (*Id.*) HSI did not communicate anything to McManus at that time about Plaintiff's mental state. (*See id.* at PageID.205.)

An FPS Alert created by McManus was issued the next day, on January 29, 2014. (*See* ECF No. 20-4, PageID.134; *see* ECF No. 20-13, PageID.197–198.) This one-page alert indicates in bolded red font that it "[e]xpires 01-29-2015." (ECF No. 20-4, PageID.134.) Beneath that, the alert lists Plaintiff's biographical information and displays his head shot. (*See id.*) The bottom half of the alert contains the following language:

> **Geographic and/or Facility Limitation**
> The originating agency is the Federal Protective Service with dissemination to FPS Region 5 LE and Protective Security Officers (PSO) located at 477 Michigan Ave. Detroit, MI and Homeland Security Investigations (HIS) [sic] offices in the Detroit area.
>
> **Details**
> On 01/28/2014, DOMINIQUE allegedly made inappropriate statements associated with violence and bodily harm with a firearm directed towards HSI employees in the Detroit, MI field office. DOMINIQUE is in possession of his HSPD-12 PIV card but is not in possession of his LE Credentials or service weapon.

**If DOMINIQUE appears on government property,
Protective Security Officers are to exercise EXTREME
CAUTION as DOMINIQUE may be armed and to
contact the Battle Creek Mega Center**[3] **[sic]
immediately. DOMINIQUE should not be detained
based solely on this Alert. DOMINIQUE must be
processed as a visitor/non-government employee and
will NOT be allowed unescorted access to any
government facility.**[4]

**Contact Information**
Federal Protective Service Battle Creek Mega Center [sic]
(BCMC) at [telephone number redacted].
**BCMC Instructions**: Notify Insp. Robert McManus at
[telephone number redacted] or Senior Special Agent (SSA)
Matthew Stone at [telephone number redacted] of
DOMINIQUE's arrival.

(*Id.* (emphasis in original).)

Creating alerts is part of McManus' job. (*See* ECF No. 20-13,
PageID.197.) McManus indicates that "[a]n alert is designed for the

---

[3] McManus indicates that "[t]he MegaCenter is our dispatch." (ECF No. 20-13, PageID.201.) It is "not located at the McNamara Building"; rather, it is in Battle Creek, Michigan. (*Id.*)

[4] Regarding this paragraph of the alert, which appears in bolded red font, McManus testified that "[t]he part where it says, if [Plaintiff] appears on government property" is "boilerplate . . . . I have never seen one that said otherwise." (ECF No. 20-13, PageID.199.) But McManus does not know why that is. (*See id.*) McManus also testified that the alert "tells the security officers that [a person is] not to be detained based upon the alert" and that he used the word "detained"—"as opposed to should not be questioned or monitored"—because "[i]t's the verbiage that's always used in the alerts." (*Id.*)

security officers, to let law enforcement personnel know that they are on site. And it's up to the law enforcement officers to investigate and see what's going on." (*Id.* at PageID.199.) According to McManus, an alert lasts one year; after that, "[i]t just ceases being an alert, unless there is additional information indicating there is a further threat." (*Id.* at PageID.198.) In creating the alert on Plaintiff, McManus intended to provide to the person reviewing it "[g]eneral information" that may require action. (*Id.* at PageID.199.) Inspector Kerwin M. Smith described an FPS Alert as "basically information put out for the safety of people working the building, and it's basically for law enforcement officers and security officers to be on alert looking for someone who may pose a harm or threat to the building." (ECF No. 20-7, PageID.139–140.) Smith testified that it "sounds fair to me" to assume that when an FPS Alert expires, "the alert and the reason for it don't exist anymore." (*Id.* at PageID.140.)

## C. Plaintiff's Visit to the McNamara Building on March 23, 2015

On March 23, 2015, Plaintiff went to the McNamara Building. (*See* ECF No. 20-2, PageID.110.) Plaintiff and the FPS agents each

present different accounts of what ensued, so these accounts are discussed separately below.

### i. Plaintiff's Account of the Visit

Plaintiff testified that he "had a lot of anxiety about" going to the McNamara Building, but "I wanted to go to . . . [Senator Gary Peters'] office, to inquire about benefits, which I should be receiving, that the agency . . . failed to process my applications for those benefits." (*Id.*) Plaintiff used the public entrance and approached the screener "as a member of the general public." (*Id.*) He showed his identification, walked through an X-ray machine carrying some papers, and again showed his identification. (*See id.*) Plaintiff does not recall if he mentioned that he used to work in the building (*see id.* at PageID.111), but he states that the following exchange between him and the screener took place:

> [T]he screener asked, where are you going? And I told him, I'm going to the [S]enator's office. He said, no, you're going to see your buddies on 18, aren't you?

> No, I'm going to see the [S]enator's office. I'm filing a congressional inquiry there. No, you're going to go see your buddies on the 18th floor. No, I'm going to the [S]enator's office, because I'm filing a congressional inquiry.

(*Id.* at PageID.110; *see id.* at PageID.111–112 ("I told them I was going to the [S]enator's office, not the 18th floor.").) Plaintiff "went through the security checkpoint, the same as anyone else in the general public would go through." (*Id.* at PageID.110.) He described this as embarrassing "[i]n a way" and "shameful" because his "entire law enforcement career [was] reduced to going through the public entrance now." (*Id.* at PageID.112.) The experience induced "anxiety," "panic," and "feelings of worthlessness." (*Id.*)

Once inside the building, Plaintiff "went directly to the elevator bank and went up to the 18th floor, and went directly to the congressman's office." (*Id.* at PageID.110.) Plaintiff spoke with someone at a window about his business with the Senator's office. (*See id.*) He heard a "snapping noise" behind him, so he turned around to see what it was. (*Id.*) An FPS agent[5] "was standing at a 5:00 position, which is an arrest, assuming an arrest position, in relation to [Plaintiff's] position," and was continuously "snapping his handcuff case open and close, open and close, open and closed, open and closed." (*Id.*) Plaintiff states that this was

---

[5] Plaintiff "believe[s]" this FPS agent was a "white guy" and "a supervisor, maybe McManus, or, Smith." (ECF No. 20-2, PageID.117.)

> so distracting, I stopped and I said hey, can I help you? And he asked, why are you here? Well, I came to the [S]enator's office.
>
> He then asked if I intended to go anywhere else. I said no, this is the only place I wanted to go. He told me that if I returned, he said I would be arrested. He said I was not allowed to speak to any ICE[6] personnel. Their office is on the same floor, as it should happen. And I told him okay.

(*Id.*) The FPS agent stood "outside the doorway for a while" because Plaintiff heard radio traffic while he continued handling his business, "and then, apparently, there was a time that [the agent] had left." (*Id.*)

When Plaintiff was finished at the Senator's office, he took the elevator to the first floor. (*See id.*) He testified that

> upon getting off of the elevator, I heard somebody's radio. Security, FPS, actually, it sounded like a whole lot of radios at the same time, saying that that subject is on the first floor, off of the elevators.
>
> At which time, I was surrounded by several officers, contract security officers, as well as FPS officers.[7] Again, I was asked

---

[6] In his deposition testimony, Plaintiff refers to HSI and ICE (U.S. Immigration and Customs Enforcement) interchangeably. (*See* ECF No. 20-2, PageID.127.) When asked to clarify this, Plaintiff stated that when he worked for HSI "I thought of myself as both" HSI and ICE. (*Id.*) He explained that "ICE was the parent agency, for Homeland Security Investigations, and Homeland Security is the parent organization for ICE." (*Id.*)

[7] Plaintiff refers to the FPS agents as "officers" throughout his deposition testimony.

what I was doing in the building. I said, once again, I'm going to the [S]enator's office, and I said that I'm done now, so I'd like to leave.

And I asked twice, I said, you know, I'd like to leave. I'd like to leave. And I was told by one of the officers, no, follow us.

And they escorted me into the mailroom [whose formal name is the business center], and that's off the lobby. And by this time, there were many of them. There were four FPS officers that were inside the mailroom with me. And the mailroom is fairly small.

And then there were the contract security guards, that were on the outside of the doorway. There's only one doorway in and out, as I recall, it was a single door, in and out. Where I was, back towards the ATM, the FPS officers were by the door, and across from the door, and outside the door.[8]

(*Id.* at PageID.110–112; *see also id.* at PageID.117–118, 124.)

---

[8] Photographs of the business center provided by Defendant show that it is off of the McNamara Building's lobby, close to the elevators, and at the end of a hallway. (*See* ECF No. 20-12.) A person entering the business center walks through two wide doorless door frames, one after the other, and faces an ATM on the far wall. (*See id.*) The photographs provide no measurements, but the door frames appear to be wider than an average door frame, possibly one-and-one-half times or double the width. (*See id.*) Plaintiff, who describes the business center's entrance as "confining" and as a "bottleneck," states that the business center has "a double door." (ECF No. 20-2, PageID.118.) Plaintiff indicates that "they always keep . . . one [door] open," but also that the door "wasn't always propped open" and would sometimes be closed or locked, and that it was "[u]sually" open during hours the public was allowed inside. (*Id.*) He does not recall if the door was open on March 23, 2015. (*See id.*) Inside the business center are three mailboxes (USPS, UPS, and FedEx), an electrical wall unit, a large cork bulletin board, and an island counter that serves as storage for a wheelchair. (*See* ECF No. 20-12.)

Plaintiff later testified that when he stepped off of the elevator on the first floor he

> encountered, I believe, a private security officer first. And he said hold on. And then the FPS officers arrived. When I told them . . . that I was leaving, that I was done. That I was leaving, and at which time, they said, you're coming with us. And we went to . . . the business center/slash mailroom.

(*Id.* at PageID.117.) Plaintiff does not recall if he initially encountered one FPS agent or a group of them, but he states that "they all were arriving roughly at the same time, so, it was kind of like being mobbed." (*Id.*)

Plaintiff estimates that he was in the business center with the FPS agents for fifteen to twenty minutes. (*See id.* at PageID.112, 119–120.) He did not check his watch during the encounter, and he is not confident about his estimate "because of my emotional state at the time," given that he found "the entire event" "upsetting" and "really traumatic." (*Id.* at PageID.120.) He states that he suffered extreme mental pain "[d]uring and after" the incident, which "[a]nyone would have felt," but his "condition definitely exacerbated the situation." (*Id.* at PageID.122.) He does not recall telling the agents what he was experiencing at the time, but he "believe[s] they should have" been able

to tell he was "experiencing extreme mental pain" based on his appearance. (*Id.*)

Plaintiff states that one FPS agent questioned him until a supervisor appeared and took over. (*See id.* at PageID.119.) Plaintiff describes the agents as "intimidating" and "very insistent." (*Id.* at PageID.111.) He testified that he was "intimidated" and "even a bit emotional" because in his "entire 20 some years in law enforcement, I could never imagine anything like this ever happening to me." (*Id.*) The agents physically intimidated him by escorting him, surrounding him, and taking him "into a more restrictive environment" for "their custodial interrogation." (*Id.* at PageID.124.) Plaintiff told them that he "believed that this was [whistleblower] reprisal for my filing an EEOC complaint, which led to my wrongful termination, which I was trying to redress properly, through the legal process." (*Id.* at PageID.111; *see id.* at PageID.119.)

Plaintiff did not try to exit the building at this point because he "didn't feel as though I was free to go." (*Id.* at PageID.118.) He did not try to walk away from the agents at any point from when he stepped off of the elevator on the first floor to when he walked into the business

center with them "[b]ecause I felt I was not free to go, and I felt at any moment, and feared at any moment, had anxiety and panic at any moment, that they would put the handcuffs on me." (*Id.* at PageID.118–119.) Plaintiff "didn't feel [that he was] eventually free to leave [the business center] at all." (*Id.* at PageID.119.)

Plaintiff "think[s] while in the business center, . . . I may have expressed my wanting to leave, and, at which time, they kept asking questions, and basically ignored the request." (*Id.* at PageID.121, 124 ("I believe I said [something to the effect of I want to leave] once while inside the business center."); *see id.* at PageID.125.) Plaintiff indicates that the agents "continued to ask me what I was doing in the building," asked him who he came to see and what the purpose of his visit was, and asked him if he still had his PIV building access card, to which he said he did not because he had returned it in the mail. (*Id.* at PageID.111, 119.) They "again stated" that he would be arrested if he ever came back to the building and that he was not allowed to talk to HSI personnel. (*Id.* at PageID.111.) Plaintiff testified that he "believe[s] at one point, I even told them, I have no intention of seeing any ICE employees. The thought of even seeing them made my stomach turn. I

didn't want to see anyone from the agency. I wanted to go to the [S]enator's office, conduct my business, and leave." (*Id.* at PageID.124.)

Plaintiff felt like the agents were talking down to him and berating him with their questioning. (*See id.*) He felt restrained against his will because their "verbal and physical cues" prevented him from leaving. (*Id.*) According to Plaintiff, the agents

> kept asking the same questions over and over again. And particularly, they had asked these questions. They never said I was free to go. They never read me my Miranda warning. And they took me from the lobby, into the mailroom. And my feeling was, if I tried to leave the mailroom, I would have had handcuffs slapped on me faster than you can imagine.

(*Id.* at PageID.111; *see id.* at PageID.119.) These considerations, in addition to Plaintiff being asked "about a crime"—namely, "theft of government property"[9]—and feeling intimidated by the many agents

---

[9] Plaintiff was asked during his deposition to elaborate on what crime the agents asked him about, and the following exchange took place:

Q. You just said, when they asked you about a crime. Do you feel they asked you about a crime?

A. Well, . . . if they're asking me about the PIV [business access] card. That certainly . . . would be like theft of government property.

Q. Did anyone ever use that phrase with you, in that conversation?

who were present, lead Plaintiff to characterize the interaction as "more than just a conversation" and to distinguish it from a "non-custodial interrogation." (*Id.* at PageID.121.)

Plaintiff does not recall if any of the agents put their hands on him. (*See id.* at PageID.118.) He saw "maybe one, two" agents place their hands on their weapons. (*Id.*) When asked if any of the agents orally threatened him, Plaintiff responded: "They said if I ever returned, I'd be arrested. They said and [sic] I was not to talk to any ICE employees . . . per HSI SAC Detroit."[10] (*Id.*) The agents did not handcuff Plaintiff, but "there was attitude on their part." (*Id.* at PageID.121.) Plaintiff "think[s] the[] [agents] were intentionally trying to intimidate me, but not necessarily humiliate me." (*Id.*) He perceived this intentional attempt to intimidate him based on their "[q]uestions, posture, [them] bringing me into the business center," them "[t]aking custody of me," and "[t]heir words, their demeanor." (*Id.*)

---

A. Theft of government property? No, but I . . . generally understood that that's what they meant, and that's what they were getting at.

(ECF No. 20-2, PageID.121.)

[10] Plaintiff indicates that these statements were made to him by agents at the Senator's office and in the business center. (*See* ECF No. 20-2, PageID.118.)

The conversation ended after "a long while," and Plaintiff, who was "in panic mode" (*id.* at PageID.111), exited the business center with the agents when "it was clear to me that the questioning was over, and we were done." (*Id.* at PageID.119.) The agents did not tell Plaintiff that they were finished or that Plaintiff could leave. (*See id.*) Plaintiff recognized one of the two or three contract guards standing outside of the business center as someone he had known for years from working at the building, so he stopped to talk to him. (*See id.* at PageID.111–112.) Plaintiff engaged in conversation with the guard, whose name is Leonardo Harris, because "I was drowning in panic here. I wanted to reach out for . . . anything that I could, to let these guys know, hey, . . . I'm not a bad guy. I'm a decent person." (*Id.* at PageID.112; *see id.* at PageID.119.) Plaintiff "tried to be as amenable [and friendly and courteous] as possible" during this exchange "[b]ecause I didn't want to give them any excuses to put those handcuffs on me." (*Id.* at PageID.111.) When Plaintiff told the guard he was "going to leave now," the response he received was "[w]ell, no, we'll take you out, we'll take you out. And I was physically escorted from the building, when I left." (*Id.* at PageID.111–112; *see id.* at PageID.119.) Plaintiff does not recall

20

how many officers escorted him to the exit and whether they were FPS agents or contract security guards. (*See id.* at PageID.112.) Plaintiff defines an arrest as "when a person is not free to go," and he testified that his arrest lasted continuously from when he encountered the FPS agent at the Senator's office to when he was escorted from the building. (*Id.* at PageID.120–121.)

Prior to this day, Plaintiff never had a problem with the FPS agents or the other officers he encountered at the McNamara Building. (*See id.* at PageID.113.) Plaintiff states that

> it seems as though on this day, everything just turned completely in 180 degrees, where I was not treated very well.
>
> Treated as a suspect, like I had done something wrong, like I was accused of a crime. And held and interrogated, . . . for anything they could come up with.

(*Id.*) Plaintiff testified that "the ICE office, of investigations, or the senior management there that day," as well as SAC Hayes,[11] "in my

---

[11] Plaintiff testified that he

was aware that one of the FPS officers did go talk to a[n] acting SAC, William Hayes, on that day. And he was one of the primary people that was involved in my whistleblower complaints, against the government, which led them, [sic] reprisal against me. Which led to my wrongful termination.

estimation, used the FPS in order to harass me, and effect whistleblower reprisal, for my EEO complaints against . . . the senior management of Homeland Security Investigations." (*Id.*) Plaintiff states the event "was reprisal" because the FPS "is part of ICE, and they answer to ICE SAC Detroit, who was engaged in retaliation against me for the whistleblower complaint." (*Id.* at PageID.120.)

Before March 23, 2015, Plaintiff had "no indication" that the FPS agents had "any knowledge" of a "disagree[ment]" between him and the Department of Homeland Security (DHS) (*id.* at PageID.113–114) or of his history with DHS. (*See id.* at PageID.120.) And Plaintiff has "no knowledge" that the agents knew he was receiving mental health treatment. (*Id.* at PageID.117.) He does not believe that any of them had "any individual reason, personal to them, to retaliate" against him. (*Id.* at PageID.120.) His only prior history or relationship with them was that "during my employment, I would see them on the elevator once in a while, and say hi to them, and that's about it." (*Id.* at PageID.121.)

---

(ECF No. 20-2, PageID.113.)

### ii. The FPS Agents' Account of the Visit

FPS agents Inspector Kerwin M. Smith, Inspector Charles D. Mendez, Area Commander Sidney D. Bowers, and Inspector Robert J. McManus worked at the McNamara Building on March 23, 2015. (*See* ECF No. 20-7, PageID.140; ECF No. 20-10, PageID.166; ECF No. 20-11, PageID.179; ECF No. 20-13, PageID.195–196.) They do not dispute that Plaintiff entered the building through the public entrance, which is on the north side of the building and has X-ray machines, walkthrough magnetometers, and several security officers.[12] (*See* ECF No. 20-7, PageID.140–141; ECF No. 20-13, PageID.196–197.) The "purpose of the

---

[12] McManus describes the screening process as follows:

At . . . the McNamara Building, when you first approach, there is an officer who asks for your identification and asks where you are going to today. That's standard procedure. Everyone gets that.

At that point in time, they also ask you to divest your property, like the airport, your electronics and metallic items, because you are going to go through a walk-through metal detector.

They obtain all your personal property, and they send it to an x-ray operator. Then you walk through a walk-through metal detector.

If you alarm, they use a hand-held metal detector to resolve the alarm, and they also check your belongings through the x-ray. After you complete that process, you gather all your belongings and you depart the scene. Then you go into the building.

(ECF No. 20-13, PageID.200–201.)

23

setup is to keep weapons and explosives out of the building." (ECF No. 20-7, PageID.140.) McManus states that "[n]o one" "like[s] going through screening," and "it makes most people nervous." (ECF No. 20-13, PageID.201.) Employees, who use the south entrance, and law enforcement officers, who can use different entrances, do not undergo security screening. (ECF No. 20-7, PageID.140–141; ECF No. 20-10, Page.ID.167; ECF No. 20-13, PageID.196.)

### a.  Inspector Kerwin M. Smith

Smith was involved in trying to locate Plaintiff in the building (*see* ECF No. 20-7, PageID.141) because he was dispatched by the MegaCenter to do so. (*See id.* at PageID.146.) When Smith was dispatched, he had no knowledge about Plaintiff going through the security checkpoint, had not seen the FPS Alert on Plaintiff, and was not aware of an alert in the system associated with Plaintiff. (*See id.*)

Smith does not recall if he saw Plaintiff on the eighteenth floor (*see id.* at PageID.141, 146) or if he met Plaintiff outside of the elevator on the first floor. (*See id.* at PageID.144.) But he remembers "being in the area on the first floor once [Plaintiff] had been located" and

speaking with him on that floor.[13] (*Id.* at PageID.141.) Defendant states in its brief that certain audio recordings submitted as exhibits indicate that "[a]t 1:44 p.m., Smith notified the MegaCenter that Plaintiff had been located on the first floor" (ECF No. 20, PageID.86 (citing ECF No. 20-8)) and that "[a]t 1:45 p.m., Smith radioed the MegaCenter that 'we'll be in the business center, first floor.'"[14] (*Id.* at PageID.86–87 (citing ECF No. 20-9).)

Smith estimates that the business center is fifteen to twenty-five feet away from the elevator, a distance that would take thirty seconds to walk. (ECF No. 20-7, PageID.147.) Smith describes the business center as a "fairly large area." (*Id.* at PageID.142.) He states that it is approximately double the size of a standard bedroom (*see id.*) and has a "very big doorway." (*Id.* at PageID.143.) The business center is open to the public and is visible to the public from the lobby. (*See id.* at PageID.147.)

---

[13] Smith also testified, however, that he "do[es]n't know if I had [a] direct discussion with [Plaintiff] or not." (ECF No. 20-7, PageID.141.)

[14] McManus testified that all conversations that take place by radio are recorded. (*See* ECF No. 20-13, PageID.200.)

Smith testified that he would have remembered if the FPS agents had forced Plaintiff into the business center "[b]ecause now . . . it's taking it to a different level" and would have been unusual. (*Id.*) Smith has no knowledge of Plaintiff being told before he entered the business center that he was free to leave. (*See id.* at PageID.148.) Smith also does not know if Plaintiff was told when he was in the business center that he did not have to answer any questions and could leave at any time. (*See id.*) When asked during his deposition if he would have stopped Plaintiff from leaving the business center, Smith responded: "Not necessarily." (*Id.* at PageID.143.) If Plaintiff had tried to leave, Smith's response would have depended on his boss' instructions. (*See id.* at PageID.143, 146.) According to Smith, he was not blocking the business center's entrance, the entrance was completely open, and Plaintiff "could have definitely looked out, gotten out" because "I'm a little guy." (*Id.* at PageID.143.) Smith was wearing a uniform, was armed, and was carrying handcuffs. (*See id.*) His arms were "probably folded," and his hand was not on his pistol. (*Id.*)

Smith testified that he, Mendez, Bowers, and McManus were in the business center with Plaintiff, but he also testified that he does not

26

recall if he was inside the business center with Plaintiff. (*See id.* at PageID.142.) He states that "[i]f I was not in the room, I was close by." (*Id.* at PageID.143.) If he was outside the business center by its entrance, which is where he believes he was but is "not 100 percent sure," he "would have been there [to] support[] the rest of the people who were there" and assist with "whatever they determined the situation was." (*Id.*) He states that "maybe one other person" was with him outside of the doorway, and that person was "maybe walking in and out." (*Id.*)

Smith estimates that Plaintiff was in the business center for approximately five minutes. (*See id.* at PageID.144–146.) Smith does not recall if Plaintiff asked if he was free to leave during this time, but from Smith's own perspective as an investigator, Plaintiff was free to leave at all times. (*See id.* at PageID.147.) Plaintiff was not physically restrained, and he was never handcuffed. (*See id.* at PageID.147–148.) Based on what Smith observed, no FPS employee touched Plaintiff, drew a weapon, or physically blocked Plaintiff from leaving. (*See id.* at PageID.148.) No one threatened Plaintiff, acted aggressively toward him, or treated him in an abusive way. (*See id.*) Smith does not recall

27

any raised voices in the business center (*see id.* at PageID.147) nor anyone telling Plaintiff that he had to leave the building or could not return to it. (*See id.* at PageID.148.) No one—not even Plaintiff— seemed upset. (*See id.* at PageID.147.) Plaintiff expressed that he was apologetic, and possibly that he was humiliated or embarrassed. (*See id.*) Plaintiff mentioned his federal employment, but he did not ask the agents to stop what they were doing because it was "causing him psychological trauma or mental pain." (*Id.*) Smith would have remembered if Plaintiff had said this; it would have been unusual. (*See id.*)

Smith testified that Plaintiff walked out of the building on his own. (*See id.* at PageID.148.) Plaintiff was not injured, was not crying, and did not seem upset or angry. (*See id.*) Smith never saw him complain to anyone about anything. (*See id.*) When Smith was on the first floor, he observed nothing indicating that Plaintiff "posed a threat from his actions." (*Id.* at PageID.144.) Smith testified that he "thought [Plaintiff] was just a member of the public on that day." (*Id.* at PageID.145.)

Prior to March 23, 2015, Smith had never met Plaintiff, but he was familiar with Plaintiff's face and had seen him as a federal employee[15] who worked in the building. (*See id.* at PageID.146.) Smith does not recall having conversations about Plaintiff, and doubts he did, because he would have had no reason to. (*See id.*) He was not aware of who Plaintiff's supervisor was or why Plaintiff was terminated. (*See id.*) Smith does not remember if on March 23, 2015 he knew that Plaintiff had been terminated. (*See id.*)

### b.   *Inspector Charles D. Mendez*

Mendez was working at his desk on the eleventh floor of the McNamara Building when he heard "radio traffic regarding a subject who possibly entered the building where there was an alert for, and . . . they were requesting additional units for an area search of the building." (ECF No. 20-10, PageID.166.) Mendez "radioed in" and told the dispatch center he was "joining in on the area search." (*Id.*) According to Mendez, Smith did the same thing from a different

---

[15] When asked during his deposition if he knew what type of federal employee Plaintiff was, Smith responded: "I don't—I didn't recall. I didn't know until I read the report." (ECF No. 20-7, PageID.146.) Smith had two FPS Reports before him at the time of his deposition (*id.* at PageID.139), but he did not specify which report he was referring to or when he read it.

location. (*See id.* at PageID.166–167.) Mendez heard on the radio that Bowers and McManus were searching on another floor. (*See id.* at PageID.166.)

Mendez left his office, and by the time he stepped into the elevator possibly a minute or so later, he heard Smith "say he was with the subject at the business center on the first floor[,] [s]o I went to the first floor." (*Id.* at PageID.166–167.) Mendez did not receive directions for him, or for all units, to go the first floor. (*See id.* at PageID.167.) He testified that "I took it upon myself" to join Smith in the business center "in order to back him up since he was out with the subject." (*Id.*) Mendez knew only what was communicated by radio; he did not know how "the subject" got into the building, who he was, where he worked, or why he was there. (*Id.* at PageID.166.) Nothing was communicated by radio about "the subject" posing a threat at that time. (*Id.* at PageID.167.) When Mendez went to the first floor, he did not know that there was an FPS Alert involving Plaintiff. (*See id.* at PageID.169.)

Mendez estimates that the business center is about fifteen feet from the elevator. (*See id.* at PageID.167.) He describes the business center as "an open space" and "a common area" with "really no door"

30

and "just an entranceway." (*Id.* at PageID.169.) The business center is open to the public, including when the events at issue in this case transpired. (*See id.* at PageID.170.) What happens in the business center is visible to a person standing outside of it and looking inside. (*See id.*)

When Mendez entered the business center, he encountered Plaintiff standing with "his back towards the ATM facing the entranceway engaged in a conversation with Inspector Smith." (*Id.* at PageID.167; *see id.* at PageID.169.) They were standing about five or ten feet inside the room having a "[n]ormal" conversation, and Mendez does not recall hearing raised voices. (*Id.* at PageID.169.) He describes Smith's demeanor as "[v]ery calm, cool." (*Id.*) Mendez was asked during his deposition what threat he perceived upon arriving at the business center and seeing Plaintiff, to which he responded: "None. None at that time." (*Id.* at PageID.167.)

No one else was in the room at first; however, McManus and possibly Bowers entered the business center shortly after Mendez arrived and before the questioning ended. (*See id.* at PageID.167, 169.) Mendez remembers a total of five people inside and outside of the

business center: four FPS personnel, plus Plaintiff. (*See id.* at PageID.169.) He does not recall if anyone else later came to the business center's entrance or entered the room because his "attention was pretty much focused" on Smith and Plaintiff "for officer safety reasons." (*Id.* at PageID.167–169.)

Mendez, who played the role of a backup officer, did not speak with Plaintiff (*see id.* at PageID.168–169), and Plaintiff did not ask him any questions. (*See id.* at PageID.170.) Mendez remembers a verbal exchange between Plaintiff and Smith only, but he does not recall the substance of the exchange. (*See id.* at PageID.168–169.) However, Mendez testified that no one told Plaintiff he could not return to the building, and Mendez does not recall anyone telling Plaintiff he had to leave the building immediately. (*See id.* at PageID.170.)

Regarding his role as a backup officer to Smith, Mendez indicates that he does not "need an active threat to back up another officer." (*Id.*) Why he backs up another officer "depends on the situation." (*Id.*) He backed up Smith

> [b]ased off of the originating call that someone with a
> possible alert had made their way into the facility, that
> would raise a level of awareness. So, therefore, when one
> officer actually meets up with the subject and engages them,

it's just routine . . . [or standard law enforcement procedure done out of ordinary caution] that another officer be present just in case.

(*Id.*)

According to Mendez, Plaintiff "eventually stated something to the effect that he was leaving, and he made his way out towards the north lobby, which is the public entrance." (*Id.* at PageID.168, 170.) Plaintiff left the business center because all questioning had ended; he did not leave in the middle of being questioned by the agents. (*See id.* at PageID.171.) Mendez is not aware of any FPS personnel escorting Plaintiff out of the building. (*See id.* at PageID.170.) Instead, Plaintiff "just walked out on his own, as far as I know." (*Id.* at PageID.171.) As soon as Plaintiff headed toward the north lobby, Mendez cleared the scene and returned to his office because he was no longer needed. (*See id.* at PageID.168.) Mendez testified that he "couldn't estimate" how long the exchange lasted, but "I can tell you, it was a very short period of time." (*Id.*) He then "guesstimate[d]" that it lasted less than five minutes. (*Id.*)

Regarding Plaintiff's ability to leave the business center, Mendez does not recall anyone telling Plaintiff that he was free to leave. (*See*

*id.*) This issue, as well as Plaintiff's departure from the building, arose later in Mendez's deposition as follows:

> Q. As far as you can tell, did [Plaintiff] ever ask if he was free to leave?
>
> A. He may have.
>
> Q. And do you recall what the answer was?
>
> A. Something to the effect that "I'm leaving." I think [Plaintiff] may have said that, and then he left.
>
> Q. Did anyone have a problem with him leaving?
>
> A. Not that I'm aware of, no, 'cause he basically just—he left. He left the area.
>
> Q. And no one tried to stop him?
>
> A. No. He was making his way to the main entrance/exit of the facility.

(*Id.* at PageID.170.)

Mendez never thought Plaintiff was not free to leave (*see id.*), and he cannot think of a reason that Plaintiff could not have left. (*See id.* at PageID.171.) According to Mendez, if Plaintiff had wanted to leave the business center, there was a route he could have taken to do so. (*See id.* at PageID.170.) Mendez testified that as a law enforcement officer, he never felt that Plaintiff was being detained. (*See id.*) When asked if he

ever felt that Plaintiff was under arrest, Mendez responded: "No, not at all." (*Id.*) Plaintiff was never handcuffed, and Mendez saw no FPS employee touch Plaintiff, draw a weapon, or try to block his path. (*See id.*) Mendez testified that no one threatened Plaintiff, spoke or acted aggressively toward him, treated him in an abusive fashion, or raised their voice in speaking with him. (*See id.*)

Mendez testified that he does not know Plaintiff. (*See id.* at PageID.166.) Prior to March 23, 2015, he had never met Plaintiff, had never seen him before, and did not know about the FPS Alert related to him. (*See id.* at PageID.169.) In addition, Mendez had never had a conversation about Plaintiff. (*See id.*) Mendez did not know that Plaintiff used to work in the building (*see id.*) and does not recall hearing Plaintiff mention his former employment or "former employment dispute with a federal agency." (*Id.* at PageID.170.) Mendez also does not recall Plaintiff saying that he was embarrassed by the encounter (*see id.*) and is not aware of Plaintiff complaining to anyone about anything. (*See id.* at PageID.171.)

### c.    Area Commander Sidney D. Bowers

Bowers also participated in the search for Plaintiff on March 23, 2015. (*See* ECF No. 20-11, PageID.179.) Accompanied by McManus, Bowers called the MegaCenter at 1:31 p.m. (*See* ECF No. 20-6, 00:00–00:05, 01:28–01:33.) Bowers indicated that Plaintiff was not wanted in the building and that a "sweep" of the building had to be conducted to locate him. (*Id.* at 00:24–00:38.) He informed the person at the MegaCenter that "we already went and checked [the eighteenth floor]. We didn't see anything . . . . We are going to take another look, though." (*Id.* at 02:01–02:08.)

Bowers did not locate Plaintiff; he "think[s] Kerwin Smith found him down on the first floor." (ECF No. 20-11, PageID.179.) Bowers went to the first floor when he was advised of this. (*See id.*) When he arrived, Plaintiff and Smith, and possibly Mendez, "were standing in the hallway next to the elevators." (*Id.*) Bowers moved the group to the business center because "[w]e were just going to talk to [Plaintiff] very briefly, and I didn't feel the need to do that out in the hallway where we had people around. So we just kind of stepped off to the side." (*Id.*)

Bowers decided to question Plaintiff in the business center instead of in the hallway

> [b]ecause I didn't want other people around. If we were going to talk to him, I don't want to talk to him right out there in public. And it was done for his benefit.

> I don't want to do anything that is going to embarrass him, talking to anybody out in public like that, even briefly.

(*Id.* at PageID.180.)

Bowers indicates that the elevator area and the business center are "both open to the public." (*Id.* at PageID.181.) But the elevator area has "pretty heavy traffic normally," and the business center "would have been largely unoccupied" at the time of day in which Plaintiff and the agents met. (*Id.*) Therefore, the business center "would have [had] more privacy." (*Id.*) When asked during his deposition if it is "possibly embarrassing for an employee or former employee to be seen talking to law enforcement," Bowers responded: "Yes." (*Id.*) Bowers testified that "[w]e didn't bring him in. We just asked him if he wanted to step over to the side with us to talk." (*Id.* at PageID.179–180.) He states that McManus "probably walked in right toward the end of it." (*Id.* at PageID.180.) Bowers does not recall other people arriving to the outside of the business center's door. (*See id.*)

37

Bowers states that the meeting inside the business center "didn't take very long" and estimates that it lasted less than five minutes. (*See id.*) Bowers did not do any questioning; it was "mainly" Smith who spoke with Plaintiff. (*Id.*) Smith's demeanor was "very casual," and he "[a]bsolutely [did] not" raise his voice. (*Id.* at PageID.181.) According to Bowers, "[t]here is [sic] no reason to." (*Id.*) Bowers describes the exchange as "just normal conversation." (*Id.*) He provided the following details when asked about it during his deposition:

> Q. What was asked?
>
> A. There really wasn't anything asked, other than what he was doing in the building. We just advised him that HSI didn't want him up in their space.
>
> And that was pretty much the end of the conversation.
>
> Q. What did he say?
>
> A. He said okay and thanked us for our time.
>
> Q. Was he emotional?
>
> A. I don't think so.

(*Id.* at PageID.180.) Bowers "did hear" that Plaintiff was noted to be emotional when he entered the building, but Bowers "didn't see him as

emotional." (*Id.*) Yet Bowers was "not really paying close attention" to Plaintiff when he was being spoken to. (*Id.*)

Bowers recalls that Plaintiff and the FPS agents stood in "kind of a circle" in the business center. (*Id.*) Specifically, Plaintiff "was standing with his back towards the entrance to the Business Center. I think Kerwin Smith was standing off to his right-hand side, Mendez was standing off to Kerwin's right-hand side and I was standing across from him." (*Id.*) Plaintiff was not standing behind the business center's table, and the agents were not standing between Plaintiff and the entrance. (*See id.*) Plaintiff was not physically restrained, and at no point did an FPS agent place a hand on his own weapon or touch Plaintiff, handcuff Plaintiff, block Plaintiff's path, or tell Plaintiff he could not leave. (*See id.* at PageID.181.) Bowers never felt that Plaintiff could not leave or was under arrest. (*See id.*) Bowers states that "[i]f [Plaintiff] wanted to turn around and walk away, he could have turned around and walked away. As a matter of fact, I do recall him asking that question, if he was being detained. The answer was no, and he was free to leave."[16] (*Id.* at

---

[16] Bowers, who supervises McManus and instructed McManus to write a report, indicates that this was said before McManus arrived. (*See* ECF No. 20-11, PageID.179, 181.)

PageID.180.) Bowers adds that Plaintiff either asked if he was being detained or if he was free to leave and that Smith "responded to him and said, 'You can go. You are not being detained.'" (*Id.* at PageID.181.)

In testifying that no one told Plaintiff that he could not leave, Bowers noted that Plaintiff returned to speak with the FPS agents[17] after heading toward the building's exit:

> As a matter of fact, once the conversation was done, everybody left the Business Center. We went out into the hallway. [Plaintiff] went over and began to talk to the PSO who had been working there that he knew, briefly.
>
> Then he started back down the hall towards the entrance, turned around and came back to us and explained again that he was not going up to HSI.

(*Id.*)

When asked during his deposition if he knows Plaintiff, Bowers testified: "Not really, no. My only knowledge of him is the day that we stopped him there at the building for about three minutes." (*Id.* at PageID.179.) Bowers knows that Plaintiff worked for HSI but "ha[s] no idea what his position was." (*Id.* at PageID.182.) He does not know if Plaintiff is a former law enforcement officer. (*See id.*)

---

[17] Plaintiff testified that he does not recall returning to speak with the FPS agents. (*See* ECF No. 20-2, PageID.112.)

### d.   Inspector Robert J. McManus

McManus first became aware of Plaintiff's presence in the building when he received a telephone call from a PSO who was a screener at the north entrance.[18] (*See* ECF No. 20-3, PageID.130; ECF No. 20-13, PageID.196, 200, 206.) The call was possibly from PSO Everette Wilson (*see* ECF No. 20-13, PageID.205), the officer "on the x-ray machine."[19] (*Id.* at PageID.201.) The PSO told McManus "that there was a person who had entered the building that he recognized [just by

---

[18] In addition to a telephone call from a PSO, an audio recording from March 23, 2015 indicates that a person at the MegaCenter left McManus a voicemail at 1:10 p.m. informing him that the MegaCenter received a call regarding Plaintiff, that Plaintiff has an expired alert and is "on the premises now," and that Plaintiff "is unescorted and going to the eighteenth floor . . . holding some files" and "going to visit some old coworkers." (ECF No. 20-5, 03:04–04:04.)

[19] The officer "running the x-ray machine" called the MegaCenter on March 23, 2015 at 1:07 p.m. (ECF No. 20-5, 00:00–00:05, 02:04–02:06.) He told the person at the MegaCenter that he has an FPS Alert for Plaintiff that "expired on the 29th of January of this year" and that Plaintiff "just entered the building, we screened him through and he's clear." (*Id.* at 00:12–00:22.) The officer reviewed the information in the alert out loud. (*See id.* at 00:22–00:27, 01:13–01:33.) He agreed with the person at the MegaCenter that Plaintiff is "unescorted" and stated that the alert is "expired, but I just wanted to contact you anyway." (*Id.* at 01:33–01:40.) The officer informed the person at the MegaCenter that Plaintiff "said he's going to the eighteenth floor to go visit some of his old buddies" (*id.* at 01:42–01:48) and that Plaintiff "is carrying a few files or something." (*Id.* at 02:11–02:15.)

41

looking at him] from an alert that had expired."[20] (*Id.* at PageID.196–197.) The PSO knew the alert was expired because "it was in the [PSO's] book of alerts. And there is a date on it. There is a date when it was issued and a date when it expires." (*Id.* at PageID.197.) The alerts are on paper and are not electronic. (*See id.*)

McManus was aware of the FPS Alert the PSO referenced because, as noted above, McManus created it based on information from HSI and after investigating "an incident that had occurred in the previous year where I was alerted to the fact that there were issues with [Plaintiff]." (*Id.* at PageID.197–199; *see* ECF No. 20-4, PageID.134.) McManus was also aware that the alert had expired, which he testified "can be relevant" to his response. (ECF No. 20-13, PageID.200.) When he was contacted by the PSO, McManus felt he had an obligation to figure out what Plaintiff was doing in the building because "[b]ased upon the information that I had received a year

---

[20] An FPS Report signed by McManus on March 23, 2015 states that he "responded to a telephonic notification that there may be a problem regarding a[n] FPS Alert subject who had entered the building." (ECF No. 20-3, PageID.129–130.) McManus wrote a report on the incident at issue in this case because he "believe[s] I initiated the action. The Protective Security Officer downstairs called me direct, so I was the person who began the process." (ECF No. 20-13, PageID.196.) McManus indicates that whoever had taken the call would have signed the report. (*See id.*)

previous, they[21] were concerned for personal safety based upon his actions and statements." (*Id.* at PageID.206.)

After receiving the PSO's call, McManus went to the first floor to speak "with the security officers [in person] to see what occurred when [Plaintiff] came in, what was his demeanor." (*Id.* at PageID.200, 206.) McManus interviewed Wilson, and Wilson told McManus that Plaintiff, "a former employee . . . who was the subject of an expired FPS alert[,] had entered the building and stated that he was going to visit some old friends on the 18th floor."[22] (ECF No. 20-3, PageID.130; *see* ECF No. 20-13, PageID.200.) Wilson reported that Plaintiff "acted somewhat emotional while undergoing the security screening process" (ECF No. 20-3, PageID.130; *see* ECF No. 20-13, PageID.200) and "seemed a little embarrassed to be going through the security screening process." (ECF No. 20-3, PageID.130; ECF No. 20-13, PageID.201.) McManus states that being emotional is different than being nervous, and McManus "believe[s]" it is "somewhat unusual." (ECF No. 20-13, PageID.201.)

---

[21] McManus does not specify who "they" refers to here. "They" presumably refers to HSI.

[22] When asked during his deposition if "this old friends thing" could possibly be inaccurate, McManus responded: "I think it's unlikely. I don't know why they'd make it up." (ECF No. 20-13, PageID.201.)

This made McManus "suspect" that Plaintiff "was troubled" before speaking with him. (*Id.*)

McManus also interviewed PSO Donovan Hollis, the officer "out front, checking the I.D. and getting the property divested," who stated that Plaintiff seemed nervous. (ECF No. 20-3, PageID.130; ECF No. 20-13, PageID.201.) McManus indicates that for Hollis "to mention [Plaintiff's nervousness], means that it was out of the ordinary." (ECF No. 20-13, PageID.201.) Additionally, Hollis told McManus that Plaintiff "offered his identification several times even though he had already shown it" (ECF No. 20-3, PageID.130), which McManus characterizes as "[v]ery odd" and "out of the ordinary." (ECF No. 20-13, PageID.201.) Hollis "further stated that the subject seemed to resent the fact that he had to undergo the security screening process mentioning several times that he used to work in the building." (ECF No. 20-3, PageID.130.) But the PSOs "[n]ever indicated . . . at all" that Plaintiff seemed threatening or was acting in an aggressive manner. (ECF No. 20-13, PageID.201.)

McManus testified that "[t]he red flags, at this point, was the fact that [Plaintiff] acted emotional, and then he was going to see old

friends. I did know that he had no friends up there, based on the previous year's encounter and information that I had received." (*Id.*) Wilson reporting that Plaintiff was acting emotional was a "red flag" because "[i]t is unusual for people to be acting emotional." (*Id.* at PageID.206.) And Wilson reporting that Plaintiff was going to see old friends was "very much" a "red flag" for McManus "[b]ecause I knew he wasn't supposed to be up there. They wanted nothing to do with him." (*Id.*) McManus "can't speculate" as to whether the situation would have been handled differently if Plaintiff had said he was going to the Senator's office. (*Id.* at PageID.202.) According to McManus, "[i]t may have been[,] . . . [b]ut the fact that he said he was going to see old friends is a red flag to me." (*Id.*) Another "red flag" was that Hollis told McManus that Plaintiff was nervous. (*Id.* at PageID.206.) McManus testified that many people are nervous when they go through screening, but Hollis mentioning this about Plaintiff indicated "an elevated level of nervousness": "In my opinion, the[] [PSOs] worked down there for years. They know what normal is. For them to express it would be abnormal." (*Id.*)

After speaking with the PSOs, McManus then "reviewed the expired FPS Alert (expiration date 01-29-2015) which stated that the subject had allegedly made inappropriate statements associated with violence and bodily harm with a firearm directed toward HSI employees in the Detroit, MI[] field office." (ECF No. 20-3, PageID.130.) Next, McManus "notified the Mega Center [sic] regarding my intention to visit the HSI office on the 18th floor and I proceeded to that location." (*Id.*) After contacting the MegaCenter, "[a]pparently" then "everyone" was notified of Plaintiff's presence in the building because "[t]he alert indicated he might be violent or here to do something that would be violent." (ECF No. 20-13, PageID.201.) Between speaking with the PSOs and going to HSI's office, McManus was trying to figure out what was happening (*see id.* at PageID.207) and did not put out an alert for anyone to apprehend Plaintiff. (*See id.* at PageID.206 ("Not at all. I never said apprehend.").)

McManus went to HSI's office, which is on the same floor as the Senator's office, and "looked around the area." (*Id.* at PageID.202; *see id.* at PageID.207.) McManus

> notified the HSI Duty Agent regarding the situation and he
> immediately contacted the HSI SAC [William Hayes] who

> instructed his personnel to notify all HSI Detroit groups
> regarding the presence of the subject and he stated to me
> that he had no business in the building with HSI and he
> requested that we attempt to locate the subject and escort
> him out of the building.

(ECF No. 20-3, PageID.130; *see* ECF No. 20-13, PageID.202, 207.)

McManus states that Hayes made this request not because of what

McManus had disclosed; rather, "[i]t was based upon their information

and their experience with [Plaintiff] in the year prior, before he left.

They were clearly concerned that he might be a person of violence—

clearly." (ECF No. 20-13, PageID.202; *see id.* at PageID.207.) Hayes

"was very concerned," which was significant to McManus because "law

enforcement personnel encounter people with all kinds of demeanors

every day. We don't get concerned easily. There has to be some basis for

that feeling. And I knew him to be credible." (*Id.* at PageID.207.)

McManus testified that after receiving Hayes' request that Plaintiff be

located and escorted from the building, McManus "still evaluate[s] the

situation" and ultimately decides what to do. (*Id.*)

When asked during his deposition if he thought that Plaintiff—

who upon entering the building went through an X-ray machine and a

metal detector—may have been carrying a hidden weapon, McManus

testified:

> Based upon the fact that he worked in the building previously, and I don't know for how long. But he was an agent, so he probably was there for a few years. You learn the ins and outs of the building.
>
> It is possible for a person, an employee with that type of knowledge, to perhaps bring things in and have them hidden.
>
> Was I hypervigilant that he might have a weapon? Probably not.
>
> But, as an example, I can do a lot of damage with just my hands. And I wasn't sure what he was capable of.
>
> * * *
>
> To my knowledge he didn't [have any peculiar or unusual physical abilities], but I don't think I do either.
>
> A person . . . can do a lot of damage with just hands. Many people are killed with just hands.
>
> And from my recollection, they were quite concerned that he would be in the building, making statements that he was going to see old friends.
>
> I am sure it was made clear to him he was not to go—they told me he had no business up there at all.

(*Id.* at PageID.202; *see id.* at PageID.206.) McManus was later asked, "Is it safe to say, in your opinion as a law enforcement officer, that a trained law enforcement officer is capable of doing more damage than a member of the public?" (*Id.* at PageID.206.) McManus responded: "Absolutely." (*Id.*)

After visiting HSI's office, McManus "notified the Mega Center [sic] regarding the situation and arranged to meet with AC Bowers in the first floor elevator lobby to coordinate a search of the building for [Plaintiff]." (ECF No. 20-3, PageID.130; ECF No. 20-13, PageID.202.) Smith and Mendez "assisted with the search." (ECF No. 20-3, PageID.130.) The search commenced, and McManus was notified that Plaintiff was in the Senator's office.[23] (*See* ECF No. 20-13, PageID.202.) McManus was then informed that Plaintiff "was apparently encountered downstairs, on the first floor again." (*Id.*) McManus agrees that the building's exit is on the first floor, which "is an entry floor";

---

[23] In his March 2015 FPS Report, McManus states that "[t]he subject was observed in the office of Senator Gary Peters on the 18th floor at which time the subject departed the Senator's office and proceeded to the first floor via the elevators." (ECF No. 20-3, PageID.130.) McManus does not state in the report how he obtained this information. But McManus testified during his deposition that after he "went to HSI" and "looked around the area[,] I went to Senator Peters' office, and they said that he had been there. So I put that information out, to let people know he had been on the 18th floor." (ECF No. 20-13, PageID.202.)

that no one from HSI is on the first floor; and that the "main concern" in looking for Plaintiff was the possibility of him going to see his old coworkers. (*Id.* at PageID.202–203.)

> An FPS Report signed by McManus on March 23, 2015 states that
>
> [u]pon arriving on the first floor, the subject encountered Inspector Smith and [sic] which time Inspector Smith and AC Bower[s] requested that the subject step into the business center for a moment to discuss the situation. Inspector Smith made a radio broadcast at that time indicating that the subject had been located.

(ECF No. 20-3, PageID.130.) McManus "went right down" to the first floor "[w]hen it came on the radio that [Plaintiff] was discovered" there. (ECF No. 20-13, PageID.204; *see id.* at PageID.203.) McManus states that "AC Bowers called me into the room at that time" (ECF No. 20-3, PageID.130), and McManus went there to support his coworkers. (*See* ECF No. 20-13, PageID.203.) He estimates that "[i]t couldn't have been more than two minutes" between "[w]hen the radio broadcast came out"[24] and when he "went to that location." (*Id.* at PageID.204.)

---

[24] McManus indicates that he "can't say" that it was "immediately" broadcasted "on that radio that they had discovered [Plaintiff] downstairs," but it "would be procedure. If I find someone we are looking for, I am going to say that I have got him located at a certain location and people would come there. They wouldn't wait." (ECF No. 20-13, PageID.204.)

McManus "arrived on the first floor and observed AC Bowers, Inspector Smith and Inspector Mendez talking to the subject inside of the business center." (ECF No. 20-3, PageID.130; *see* ECF No. 20-13, PageID.203, 207.) McManus "came in [to the business center] as [the questioning] was completing." (ECF No. 20-13, PageID.204.) He "ha[s] no recollection [of] where [Plaintiff] was standing" inside the business center" (*id.* at PageID.203) and "ha[s] no idea" where the other agents stood. (*Id.* at PageID.207.) McManus does not recall additional security being present outside of the business center's door. (*See id.* at PageID.203.) He states that "[p]eople could be passing by, but nobody was standing by." (*Id.*) Further, McManus states that the entrance was not blocked. (*See id.*) McManus agreed during his deposition that the business center has "like an open entrance" that is "an extra-wide space, like there would be two doors, but I don't believe there are doors on the facility." (*Id.* at PageID.207.) McManus states that if a member of the public had wanted to use the ATM inside of the business center while the agents were meeting with Plaintiff, "[w]e would not have impeded anybody's traffic." (*Id.* at PageID.204.)

During his deposition, McManus was asked about the number of FPS agents who were present in the business center with Plaintiff, and the following exchange took place:

> Q. Do you think you could have handled this conversation by yourself?
>
> A. That is not how law enforcement operations are conducted, sir. You always have additional people.
>
> Q. Is that the term "a show of strength"?
>
> A. It's just a policy. It is a procedure. You always have more than one officer when possible, always.
>
> Q. Why four or more?
>
> A. [Plaintiff] was a former law enforcement officer, who had extensive training in weapons[25] and self-defense tactics. He is not the average guy on the street.

(*Id.* at PageID.205.)

McManus testified that what took place inside of the business center "was a casual encounter. This was not a detention."[26] (*Id.* at

---

[25] Plaintiff formerly worked for HSI. According to McManus, all HSI agents are armed. (*See* ECF No. 20-13, PageID.205.)

[26] McManus defines "detained" as a situation in which "I have taken control of someone for a period of time if I have detained them." (ECF No. 20-13, PageID.199.) "Control" refers to controlling that person's movements. (*Id.*) In some cases, the person would be prevented from leaving, "[d]epending upon what the situation would be, the seriousness or what we are looking into." (*Id.*)

PageID.203.) McManus describes the exchange as "[v]ery casual." (*Id.* at PageID.208.) He does not remember any raised voices, and he "do[es]n't remember specifically anything out of the ordinary" about Smith's demeanor. (*Id.* at PageID.207.) McManus never felt that Plaintiff was under arrest or not free to leave. (*See id.*) Plaintiff was not handcuffed at any point, and McManus did not see Plaintiff be physically restrained. (*See id.*) McManus did not see an FPS employee touch Plaintiff, draw a weapon, or physically block Plaintiff's path. (*See id.* at PageID.207–208.) Nor did he see anyone threaten Plaintiff, act aggressively toward Plaintiff, or treat Plaintiff in an abusive or impolite manner. (*See id.* at PageID.208.)

Regarding the substance of the exchange, McManus testified that "[a]ll I remember is it was a casual conversation. Basically, what are you doing in the building? What is going on?" (*Id.* at PageID.204.) McManus' March 2015 FPS Report elaborates on this as follows:

> The subject stated that he was in the building to go to the Senator's office and at no time did he want to go to the HSI office. The subject then stated that he had been wrongfully terminated and that he was pursuing action to correct the situation. He then again stated that he had no intention of going to the HSI office. He stated that the thought of going there made him sick. Inspector Smith suggested that he

> check in with the north lobby PSO the next time that he
> comes to the building to visit the Senator's office in order to
> avoid a similar situation. Upon obtaining this information,
> we thanked the subject for his time . . . .

(ECF No. 20-3, PageID.130–131.) McManus "do[es]n't recall talking"

(ECF No. 20-13, PageID.207), but he does not doubt that he thanked

Plaintiff for his time because "I do that with everyone." (*Id.* at

PageID.204.)

McManus states that Plaintiff "reiterat[ed] his employment

dilemma" (*id.* at PageID.207) and that during the exchange Plaintiff

> seemed emotional. I actually felt a little sorry for him.

> I am somewhat of a compassionate person. I am not just a
> standard law enforcement guy.

> The guy was clearly struggling and upset that he had lost
> his position, and I can only imagine how hard that would be.
> He kept reiterating the story. I felt sorry for him.

(*Id.* at PageID.207; *see id.* at PageID.208 ("I remember him being

emotional, but I don't remember if he cried.").) At the same time,

Plaintiff did not seem injured and did not complain about how he was

treated. (*See id.* at PageID.208.)

McManus "do[es]n't recall" if Plaintiff asked if he was free to leave

or if Plaintiff was told that he had to leave the building. (*Id.* at

PageID.207–208.) McManus was asked during his deposition if he would have allowed Plaintiff to leave at any time, to which he responded: "Absolutely. I would have, but I was not the lead person on the scene." (*Id.* at PageID.203.) Because he arrived last and was not the person asking Plaintiff questions, McManus "ha[s] no idea" if Plaintiff was told that he did not have to answer questions and could leave at any time. (*Id.*)

McManus testified that the encounter ended when "[w]e moved into the south lobby area, which is a little larger area. We just sort of moved out there. The conversation ended, have a great day or thank you for your time. We didn't escort him out. He walked toward the north lobby." (*Id.* at PageID.208.) This is consistent with how McManus concludes the narrative section of his March 2015 FPS Report:

> [W]e all (including the subject) departed the business center into the south lobby. The subject began to go to the north lobby to depart the building as we (FPS personnel) stopped in the south lobby to talk for a minute at which time the subject returned to us and began explaining his [employment dilemma or] situation again. He also greeted and talk[ed] to the south lobby PSO (Leonardo Harris) for a minute. The subject then proceeded to the north lobby and stopped and talked to PSO Wilson for a moment before departing the building. PSO Wilson further states that the subject again attempted to explain his situation to him and

told him that he would check in with him (Wilson) the next time that he visits the Senator.

AC Bowers briefed HSI on what had occurred.

I instructed PSO Wilson to edit all alerts and give the expired alerts to his supervision for shredding.

All units cleared the scene.

(ECF No. 20-3, PageID.131; *see* ECF No. 20-13, PageID.208.) McManus states that when Plaintiff returned to speak with the FPS agents and PSOs "[i]t was his choice to walk back to us and then to the PSO[s]," and no one made him leave. (ECF No. 20-13, PageID.208.)

Regarding the expired FPS Alert related to Plaintiff, McManus testified: "The alert had expired, . . . but the concern for [Plaintiff's] behavior had not." (*Id.* at PageID.203.) McManus agrees that Plaintiff did not carry out a criminal act and did not threaten anybody. (*See id.* at PageID.203–205.) But he states that Plaintiff "did pose a threat a year earlier." (*Id.* at PageID.205.) As for McManus instructing Wilson to edit all alerts and give the expired ones to supervision for shredding (*see* ECF No. 20-3, PageID.130; ECF No. 20-13, PageID.204), McManus indicates that he "wanted the alert book updated, so we didn't have expired alerts in there. They are not supposed to be in there. . . . [T]he

56

alerts, if they are expired, should be removed. That's a policy." (ECF No. 20-13, PageID.204.) McManus "believe[s] Plaintiff would have been stopped" even if the alert on him had been removed. (*Id.*)

McManus, who at the time of his deposition was sixty-one years old, has worked in law enforcement and security administration for "easily 30 years." (*Id.* at PageID.195.) As part of his daily uniform McManus wears a belt that carries a firearm, two pairs of handcuffs, additional ammunition, a Taser, a radio, a glove case, and a flashlight. (*Id.*) He is 6'4" tall and weighs 215 pounds. (*See id.* at PageID.200, 205.) He recognizes that he is an "imposing figure" and that "[o]fficer presence is a level of force." (*Id.* at PageID.200.) He states that "[m]y policy, and something I work with every day, is firm and polite." (*Id.*) He generally does not raise his voice when he is working, and he distinguished himself from "most law enforcement officers" because "I approach scenes and ask how I can help. My intention is to diffuse things, give an opportunity for everyone to just take a breath and think he is not here to be a jerk, he is here to see what is going on." (*Id.*)

When asked during his deposition if he knew Plaintiff, McManus testified that "I know of him. I didn't know him personally. I saw him

around the building prior to the incident, yes." (*Id.* at PageID.195–196.)
Before March 23, 2015, McManus was aware that Plaintiff worked in
the building but "only knew him by saying, hi, how are you doing, you
know, passing in the halls." (*See id.* at PageID.196.) McManus never
had a conversation with Plaintiff (*see id.* at PageID.206), did not know
what department Plaintiff worked for (*see id.* at PageID.196), and did
not know anything about Plaintiff's psychological state. (*See id.* at
PageID.206.) McManus only knew that HSI "had removed his
credentials and his weapon" and that "there were other personnel
actions pending." (*Id.*) McManus does not recall having a conversation
with anyone about Plaintiff between January 28, 2014, when he created
the FPS Report that led to the FPS Alert, and March 23, 2015, when
Plaintiff visited the McNamara Building. (*See id.*)

### D. Plaintiff's Complaint and Defendant's Motion for Summary Judgment

On December 6, 2018, Plaintiff filed the complaint in this case
under the FTCA.[27] (ECF No. 1.) Plaintiff challenges the conduct of

---

[27] The "FTCA bars claimants from bringing suit in federal court until they
have exhausted their administrative remedies." *Kellom v. Quinn*, No. 17-11084,
2018 WL 4111906, at *4 (E.D. Mich. Aug. 29, 2018) (quoting *McNeil v. United
States*, 508 U.S. 106, 113 (1993)). To satisfy this exhaustion requirement, "[t]he

unnamed "Defendant's agents" and asserts claims against Defendant of false arrest (Count I), false imprisonment (Count II), and intentional infliction of emotional distress (Count III). (*Id.* at PageID.3–5.) Plaintiff seeks various forms of monetary relief, including "compensatory damages against Defendant in an amount exceeding $250,000.00." (*Id.* at PageID.5.) Defendant now seeks summary judgment on all of Plaintiff's claims and argues that it is entitled to governmental immunity.

## II.   Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

---

plaintiff must 'give[] the agency written notice of his or her claim sufficient to enable the agency to investigate and . . . place a value on his or her claims.'" *Cholewa v. United States*, No. 19-cv-12190, 2020 WL 4583909, at *8 (E.D. Mich. Aug. 10, 2020) (quoting *Sellers v. United States*, 870 F.2d 1098, 1101 (6th Cir. 1989)). Here, Plaintiff indicates in the complaint that "[p]ursuant to 28 U.S.C.A. § 2675(a) the claim set forth was originally presented to the United States Department of Homeland Security (DHS) on August 15, 2016" and that "[o]n June 18, 2018, DHS denied Plaintiff's claim." (ECF No. 1, PageID.2.) Defendant does not dispute these assertions. (*See* ECF No. 10, PageID.36.) Therefore, Plaintiff has satisfied the FTCA's exhaustion requirement.

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir. 2002)).

## III.  Analysis

Plaintiff brings this case under the FTCA. The FTCA does not create a federal cause of action against the United States, but rather waives the United States' sovereign immunity from certain types of claims.[28] The United States is subject to liability for torts "in the same

---

[28] Plaintiff's claims against Defendant of false arrest, false imprisonment, and intentional infliction of emotional distress (IIED) are not barred by the FTCA. "Although generally exempted from liability under the FTCA for intentional torts, the United States remains liable for claims arising from certain intentional torts committed by investigative or law enforcement officers, including . . . false imprisonment, [and] false arrest . . . ." *Valdez v. United States*, 58 F. Supp. 3d 795, 827 (W.D. Mich. 2014) (citing 28 U.S.C. § 2680(h)); *see Milligan v. United States*, 670 F.3d 686, 695 (6th Cir. 2012) ("If a federal law enforcement or investigative officer engages in '. . . false imprisonment, [or] false arrest . . . ,' sovereign immunity is waived and courts have subject matter jurisdiction under the FTCA." (footnote omitted) (quoting 28 U.S.C. § 2680(h))). Moreover, "[t]he FTCA does not bar suits against the United States for IIED." *Taylor v. United States*, No. 2:03-CV-2589, 2008 WL 152896, at *10 (W.D. Tenn. Jan. 14, 2008) (citing 28 U.S.C. § 2680(h); *Sheehan v. United States*, 896 F.2d 1168, 1172 (9th Cir. 1990); *Gross v. United States*, 676 F.2d 295, 304 (8th Cir. 1982)); *see Zelaya v. Hammer*, No. 3:19-cv-62, 2021 WL 424434, at *24 (E.D. Tenn. Jan. 31, 2021) (concluding that dismissal of the plaintiffs' IIED claims under the FTCA "is not appropriate" because "§ 1346(b)

manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, provided that a private person "would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The "law of the place" means the law of the state. *FDIC v. Meyer*, 510 U.S. 471, 478 (1994). Here, that is Michigan law.

## A. False Arrest and False Imprisonment Claims (Counts I and II)

Plaintiff alleges in his false arrest claim in Count I that he was arrested by "several FPS agents . . . without any legal justification." (ECF No. 1, PageID.3.) Plaintiff states that he "was innocent of any wrongdoing" and that as a result of the arrest he "was de[p]rived of his liberty, . . . has suffered extreme mental pain, anguish, and suffering, and has been deeply humiliated and embarrassed." (*Id.*) In Count II, Plaintiff makes the following allegations as to his false imprisonment claim:

---

waives federal sovereign immunity except as provided in § 2680(h), and § 2680(h) does not, at the threshold, bar IIED . . . claims"); *Lovely v. United States*, 570 F.3d 778, 782 n.3 (6th Cir. 2009) (stating that "we have not previously treated [IIED] claims as barred by the § 2680(h) exception").

22. That Plaintiff was imprisoned and restrained against his will.

23. That Defendant's agents accomplished the imprisonment by physical force[.]

24. That the deprivation of Plaintiff[']s liberty and freedom was intentional, unlawful, unprivileged, unreasonable, and without probable cause.

25. That as a direct and proximate cause of Plaintiff's false imprisonment and interrogation, Plaintiff has suffered extreme mental pain, anguish, and suffering, and has been deeply humiliated and embarrassed.

(*Id.* at PageID.3–4.) Defendant argues that it is entitled to summary judgment on these claims because "Plaintiff's interaction with federal agents was a consensual encounter" (ECF No. 20, PageID.73, 95) or a lawful *Terry* stop in which Plaintiff was detained "briefly . . . for investigative purposes." (*Id.* at PageID.95.) Defendant argues that the interaction "never became an arrest." (*Id.* at PageID.97.)

"Under Michigan law, 'false arrest is an illegal or unjustified arrest, and the guilt or innocence of the person arrested is irrelevant.'" *Wolfe v. Perry*, 412 F.3d 707, 715 (6th Cir. 2005) (quoting *Peterson Novelties, Inc. v. City of Berkley*, 259 Mich. App. 1, 18 (2003)). "[F]alse imprisonment is 'an unlawful restraint on a person's liberty or freedom

of movement.'" *Ericksen v. United States*, No. 16-CV-13038, 2017 WL
930034, at *2 (E.D. Mich. Mar. 9, 2017) (quoting *Peterson Novelties,
Inc.*, 259 Mich. App. at 17–18), *aff'd*, 711 F. App'x 789 (6th Cir. 2018). A
false imprisonment claim's elements are: "(1) an act committed with the
intention of confining another, (2) the act directly or indirectly results in
such confinement, (3) the person confined is conscious of his
confinement, and (4) the imprisonment was false—without the right or
authority to confine." *Id.* (citing *Moore v. City of Detroit*, 252 Mich. App.
384, 387–88 (2002)).

The Sixth Circuit recently treated a false arrest claim and a false
imprisonment claim "as one" because "[u]nder both Michigan and
federal law, . . . false arrest is a subspecies of false imprisonment; an
unlawful arrest is just one way to imprison someone." *Saltmarshall v.
Prime Healthcare Servs.-Garden City LLC*, 831 F. App'x 764, 768 (6th
Cir. 2020) (citing *Wallace v. Kato*, 549 U.S. 384, 388 (2007); *Peterson
Novelties, Inc.*, 259 Mich. App. at 17–18). To prevail on a false arrest or
false imprisonment claim under Michigan law, "a plaintiff must show
that the arrest was not legal, i.e., the arrest was not based on probable
cause. If the arrest was legal, there has not been a false arrest or false

imprisonment." *Seales v. City of Detroit, Mich.*, 959 F.3d 235, 243 (6th Cir. 2020) (quoting *Peterson Novelties, Inc.*, 259 Mich. App. at 18; citing *Odom v. Wayne Cnty.*, 482 Mich. 459, 481–82 (2008)). "[P]robable cause exists when the totality of the circumstances known to an officer at the time support the reasonable belief that a criminal offense has occurred or is ongoing." *Saltmarshall*, 831 F. App'x at 768–69 (citing *Jones v. City of Elyria*, 947 F.3d 905, 914 (6th Cir. 2020); *People v. Yost*, 468 Mich. 122, 126 (2003)).

The Michigan Supreme Court "has categorized police-citizen encounters as falling under three different tiers," and only the third tier—a "full arrest"—requires probable cause. *People v. Lefree*, No. 317502, 2014 WL 6468187, at *3 (Mich. Ct. App. Nov. 18, 2014) (citing *People v. Shabaz*, 424 Mich. 42, 56–58 (1985)). "The first tier consists of a police officer asking mere non-coercive questions of a person in a public setting. . . . No level of suspicion is required for an officer to engage in such contact." *Id.* (citing *Shabaz*, 424 Mich. at 56–57). "When an officer approaches a person and seeks voluntary cooperation through noncoercive questioning, there is no restraint on that person's liberty,

and the person is not seized."[29] *People v. Kelel*, No. 336268, 2018 WL 1020610, at \*2 (Mich. Ct. App. Feb. 22, 2018) (quoting *People v. Jenkins*, 472 Mich. 26, 33 (2005)).

> "A 'seizure' within the meaning of the Fourth Amendment occurs only if, in view of all the circumstances, a reasonable person would have believed that he was not free to leave." *Id.* In other words, a person may be approached in a public place by an officer and asked questions and, unless there is some form of coercion or detention, there is no seizure. *Id.* at 33; *People v. Shabaz*, 424 Mich. 42, 56–57; 378 N.W.2d 451 (1985) (citation omitted); see also *Muehler v. Mena*, 544 U.S. 93, 100–101; 125 S. Ct. 1465; 161 L. Ed. 2d 299 (2005) ("We have held repeatedly that mere police questioning does not constitute a seizure." (quotation marks and citation omitted)).

---

[29] "The right to be free from unreasonable searches and seizures is guaranteed by both the United States Constitution and the Michigan Constitution." *People v. Jenkins*, No. 340386, 2019 WL 845742, at \*3 (Mich. Ct. App. Feb. 21, 2019) (internal citations omitted), *appeal denied*, 504 Mich. 903 (2019). The Michigan Court of Appeals has stated that

> [g]enerally, a search or seizure conducted without a warrant is presumptively unreasonable, and thus, unconstitutional. *People v. Barbarich*, 291 Mich. App. 468, 472; 807 N.W.2d 56 (2011). However, the Fourth Amendment protections against unreasonable searches and seizures only apply to governmental conduct that can reasonably be characterized as a "search" or a "seizure." *People v. Frohriep*, 247 Mich. App. 692, 699; 637 N.W.2d 562 (2001). Not all encounters between police officers and persons are "seizures." *Jenkins*, 472 Mich. at 32.

*People v. Young*, No. 344888, 2019 WL 6248352, at \*2 (Mich. Ct. App. Nov. 21, 2019) (footnote omitted).

*People v. Young*, No. 344888, 2019 WL 6248352, at \*2 (Mich. Ct. App. Nov. 21, 2019). "The 'reasonable person' for purposes of this inquiry is an 'innocent person.'" *People v. Mann*, No. 205373, 1998 WL 1986986, at \*1 (Mich. Ct. App. Dec. 29, 1998) (citing *Florida v. Bostick*, 501 U.S. 429, 438 (1991)). "The test is an objective one." *Id.* (citing *California v. Hodari D*, 499 U.S. 621, 628 (1991)). "Consent must be freely and voluntarily given, and '[t]he presence of coercion or duress normally militates against a finding of voluntariness.'" *People v. Johnson*, No. 346239, 2020 WL 4235743, at \*6 (Mich. Ct. App. July 23, 2020) (quoting *People v. Borchard-Ruhland*, 460 Mich. 278, 294 (1999)).

"The second tier involves a stop on the basis of reasonable suspicion 'that a person has committed or is about to commit a crime.'" *Lefree*, 2014 WL 6468187, at \*3 (quoting *Shabaz*, 424 Mich. at 57). This type of encounter is an "investigatory stop." *People v. Trimmer*, No. 296406, 2011 WL 683041, at \*1 (Mich. Ct. App. Feb. 24, 2011) (internal citation omitted). "An investigatory stop, which is limited to a brief and nonintrusive detention, constitutes a Fourth Amendment seizure." *People v. Bashi*, No. 286239, 2009 WL 3287400, at \*1 (Mich. Ct. App. Oct. 13, 2009) (quoting *People v. Jones*, 260 Mich. App. 424, 429 (2004)).

The Michigan Supreme Court discussed an investigative stop, which is also known as a *Terry* stop,[30] as follows:

> Under certain circumstances, a police officer may approach and temporarily detain a person for the purpose of investigating possible criminal behavior even though there is no probable cause to support an arrest. A brief detention does not violate the Fourth Amendment if the officer has a reasonably articulable suspicion that criminal activity is afoot. Whether an officer has a reasonable suspicion to make such an investigatory stop is determined case by case, on the basis of an analysis of the totality of the facts and circumstances. A determination regarding whether a reasonable suspicion exists must be based on commonsense judgments and inferences about human behavior.

*People v. Hughes*, No. 344066, 2019 WL 6519104, at *2 (Mich. Ct. App. Dec. 3, 2019) (quoting *Jenkins*, 472 Mich. at 32). Michigan courts instruct that

> "in determining whether the totality of the circumstances provide reasonable suspicion to support an investigatory

---

[30] In *Terry v. Ohio*, 392 U.S. 1, 30–31 (1968),

the United States Supreme Court held that in certain circumstances a police officer may "stop" and briefly detain a person consistently with the Fourth Amendment on the basis of reasonable suspicion that criminal activity may be afoot. Notably, "[t]he type of intrusion authorized by [*Terry*] has been extended to permit investigative stops under various circumstances. . . ." *Nelson*, at 631, 505 N.W.2d 266.

*People v. Oliver*, 464 Mich. 184, 193 (2001).

67

stop, those circumstances must be viewed as understood and interpreted by law enforcement officers, not legal scholars. Also, common sense and everyday life experiences predominate over uncompromising standards." *People v. Oliver*, 464 Mich. 184, 192, 627 N.W.2d 297 (2001) (quotation marks, alterations, and citations omitted). Law enforcement officers "are permitted, if not required, to consider the modes or patterns of operation of certain kinds of lawbreakers" and then make "inferences and deductions that might well elude an untrained person." *Id.* at 196, 627 N.W.2d 297 (quotation marks, alterations, and citations omitted).

*People v. Wheeler*, No. 353419, 2021 WL 935709, at *2 (Mich. Ct. App. Mar. 11, 2021).

"The third tier [of police-citizen encounters] involves the full arrest of an individual and requires probable cause." *Lefree*, 2014 WL 6468187, at *3 (quoting *Shabaz*, 424 Mich. at 58).

As noted, Defendant seeks summary judgment on Plaintiff's false arrest and false imprisonment claims on the basis that "Plaintiff's brief interaction with the FPS agents was either a consensual encounter or a *Terry* stop, with no unlawful restraint on Plaintiff's liberty." (ECF No. 20, PageID.100.) In other words, Defendant argues that the interaction between Plaintiff and the FPS agents falls under the first two tiers of police-citizen encounters discussed above, which do not require probable cause.

68

Case 5:18-cv-13777-JEL-EAS    ECF No. 25, PageID.446    Filed 07/20/21    Page 69 of 113

### i.    *Consensual Encounter*

Defendant argues that Plaintiff's initial encounter with the FPS agent at the Senator's office "as described by Plaintiff, did not involve being detained or restrained, and is therefore consensual."[31] (*Id.* at PageID.93–94.) Defendant also argues that "Plaintiff's encounter with Smith outside the first floor elevator at least began consensually" (*id.* at PageID.94) and that "Plaintiff's own testimony shows that [the] encounter [with the agents in the business center], which took 20 minutes or less, was consensual." (*Id.* at PageID.95.) In response, Plaintiff argues that his "encounter with FPS agents outside of the elevator does not constitute a casual encounter" (ECF No. 22, PageID.223) and that his subsequent interaction with the agents in the business center "was clearly not a consensual encounter." (*Id.* at PageID.224.) Plaintiff makes no argument with respect to the nature of his encounter with the FPS agent at the Senator's office.

Plaintiff's encounter with the FPS agent at the Senator's office did not amount to a seizure. Plaintiff testified that a "snapping noise"

---

[31] In making this argument, Defendant references Plaintiff's testimony that "he was arrested from the moment the unknown FPS agent spoke with him in the Senator's office to the moment he was escorted out of the building." (ECF No. 20, PageID.93 (citing ECF No. 20-2, PageID.120–121).)

alerted him to the agent's presence, and the sound was "so distracting" that Plaintiff initiated a conversation with him. (ECF No. 20-2, PageID.110.) Plaintiff asked the agent, "[C]an I help you?" and the agent then asked Plaintiff, "[W]hy are you here?" (*Id.*) The agent also asked Plaintiff "if I intended to go anywhere else." (*Id.*) Plaintiff chose to answer these questions, and in response to the agent's comments Plaintiff "told him okay." (*Id.*) Plaintiff testified that the agent "stood outside the doorway for a while" and that at some point "apparently, there was a time that he had left." (*Id.*) When Plaintiff finished his business at the Senator's office, he stepped into the elevator and went down to the first floor unaccompanied by the agent. (*See id.*)

Plaintiff provides no evidence that he was coerced or detained during this initial encounter with the FPS agent at the Senator's office, which is a public place. Plaintiff was the first to engage in conversation with the agent, and he answered the agent's questions voluntarily. Plaintiff continued handling his business at the Senator's office after speaking with the agent, and Plaintiff left the eighteenth floor freely and on his own. In other words, "nothing in the record suggests 'that intimidating circumstances compelled [Plaintiff] to cooperate.'" *People v.*

*Ramos*, No. 329057, 2016 WL 7333424, at *4 (Mich. Ct. App. Dec. 15, 2016) (quoting *People v. Shankle*, 227 Mich. App. 690, 697 (1998)). Moreover, even if Plaintiff were to argue that the encounter was a seizure because the FPS agent followed him to the Senator's office, an "officer's decision to follow someone does not by itself amount to intimidating conduct that would cause a reasonable person to believe that he or she was not at liberty to leave." *People v. Lucynski*, No. 353646, 2020 WL 7417506, at *3 (Mich. Ct. App. Dec. 17, 2020) (citing *People v. Jackson*, 175 Mich. App. 562, 563–64 (1988)).

However, a material question of fact exists as to whether Plaintiff was seized by the FPS agents on the first floor. Viewing the facts in a light most favorable to Plaintiff, a jury could conclude that Plaintiff was seized from the moment he exited the elevator on the first floor because at that point a reasonable person would have believed that the person was not free to leave. Plaintiff testified that when he stepped off of the elevator on the first floor he "was surrounded by several officers," including FPS agents, who asked him what he was doing in the building. (ECF No. 20-2, PageID.111.) Plaintiff informed them that he was done with his business at the Senator's office, "so I'd like to leave.

71

And I asked twice, I said, . . . I'd like to leave. I'd like to leave. And I was told by one of the officers, no, follow us." (*Id.*) Plaintiff states that he was then "escorted" to the business center. (*Id.*) Defendant argues that Plaintiff tells "two different versions of this story" (ECF No. 20, PageID.94) because he testified later in his deposition that when he came off of the elevator he first encountered a private security officer, who "said hold on," and then FPS agents arrived. In this second version, Plaintiff "told them . . . that I was leaving, that I was done. That I was leaving, and at which time they said, you're coming with us.[32] And we went . . . to the business center/slash mailroom." (ECF No. 20-2, PageID.117.) In both accounts, however, Plaintiff expressed a desire to leave to the FPS agents that they did not grant. Whether the agents said "no, follow us" or "you're coming with us" in response to Plaintiff's request, a reasonable person would interpret either of those responses as indicating that the person was not free to leave.

A jury viewing the facts in a light most favorable to Plaintiff could also find that the encounter inside the business center was a seizure.

---

[32] Plaintiff does not specify who "them" and "they" refer to, but these pronouns presumably refer to the FPS agents who he says "arrived." (ECF No. 20-2, PageID.117.)

Relying on United States Supreme Court precedent, Michigan courts have indicated that

> [e]xamples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. [*United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980).]

*People v. Trapp*, No. 345293, 2020 WL 7413836, at *6 (Mich. Ct. App. Dec. 17, 2020); *see People v. Gillam*, 479 Mich. 253, 263 (2007) (providing the same "examples of situations in which a reasonable person would not believe that he or she was free to leave").

In this case, the FPS agents testified that they did not touch Plaintiff[33] (*see* ECF No. 20-7, PageID.148; ECF No. 20-10, PageID.170; ECF No. 20-11, PageID.181; ECF No. 20-13, PageID.207–208) and did not raise their voices in speaking with him in the business center (*see* ECF No. 20-7, PageID.147; ECF No. 20-10, PageID.169–170; ECF No. 20-11, PageID.181; ECF No. 20-13, PageID.207), which is open to the public. (*See* ECF No. 20-10, PageID.170; ECF No. 20-11, PageID.181.)

---

[33] Plaintiff does not recall if the agents touched him. (*See* ECF No. 20-2, PageID.118.)

The agents describe Smith's demeanor as "casual," and they describe the exchange as a "casual encounter" or a "casual conversation" that "was not a detention" and from which Plaintiff was free to leave. (ECF No. 20-10, PageID.170; ECF No. 20-11, PageID.181; ECF No. 20-13, PageID.203–204, 207–208.) However, four agents were inside of the business center with Plaintiff (*see* ECF No. 20-2, PageID.111), and at least two of them—Smith and McManus—were uniformed and armed. (*See* ECF No. 20-7, PageID.143; ECF No. 20-13, PageID.195.) McManus' uniform includes a belt that carries a firearm, two pairs of handcuffs, additional ammunition, and a Taser. (*See* ECF No. 20-13, PageID.195.) According to Plaintiff, "maybe one, two" agents placed their hands on their weapons (ECF No. 20-2, PageID.118), and the agents were "by the door," "across from the door," and "outside the door." (*Id.* at PageID.111.) Plaintiff testified that the agents' "verbal and physical cues" prevented him from leaving. (*Id.* at PageID.124.) These considerations would allow a jury to conclude that Plaintiff was seized when he was inside of the business center.

In addition, Plaintiff states that he "may have" expressed a desire to leave, but the agents "kept asking questions, and basically ignored

the request." (*Id.* at PageID.121.) Plaintiff testified that the agents repeated the same questions to him "over and over again" and that their questions about the PIV building access card were accusatory. "[R]epetitive, potentially incriminating questions undoubtedly would lead a reasonable person to believe that he was less able to terminate the encounter." *People v. Bloxson*, 205 Mich. App. 236, 244 (1994) (internal citation omitted). Moreover, Plaintiff testified that the agents talked down to him, berated him (*see* ECF No. 20-2, PageID.124), had "attitude" (*id.* at PageID.121), and were "intimidating" and "very insistent." (*Id.* at PageID.111.) Plaintiff testified that he exited the business center with the agents when the questioning was over (*see id.* at PageID.119) and that he was "physically escorted from the building." (*Id.* at PageID.111.) Considering all of these circumstances in a light most favorable to Plaintiff, a jury could conclude that a reasonable person in Plaintiff's situation would not have felt free to walk away from the FPS agents.

Accordingly, Plaintiff's interaction with the FPS agent on the eighteenth floor was a consensual encounter, but his interaction with the FPS agents on the first floor was not.

ii.    *Investigative Stop*

Defendant argues that "[e]ven if the Court construe[s] Plaintiff's question of whether he was allowed to leave as ending the consensual encounter, the agents were legally permitted to stop and briefly detain Plaintiff for investigative purposes" under *Terry v. Ohio*, 392 U.S. 1 (1968), because the agents had "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" (ECF No. 20, PageID.95, 97 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989).) Defendant argues that "the standard for a *Terry* stop was met" in this case "by the knowledge possessed by McManus when he asked the MegaCenter to order the FPS agents to conduct a search and locate Plaintiff," and therefore, "the questioning of Plaintiff for 20 minutes or less was lawful." (*Id.* at PageID.97.) Specifically, Defendant states that

McManus knew of the following factors when he requested a sweep[34] to locate Plaintiff:

■ HSI had previously feared that Plaintiff might be armed with a firearm and might be capable of

---

[34] The Court notes that an audio recording provided by Defendant indicates that Bowers, who was accompanied by McManus, called the MegaCenter and requested a "sweep" to locate Plaintiff in the McNamara Building. (ECF No. 20-6, 00:00–00:05, 00:24–00:38, 01:28–01:33.)

committing workplace violence at his former
workplace. (Ex. 3, FPS Alert).

- Plaintiff was a former law enforcement officer, with
training in weapons and self-defense tactics. (Ex. 12.
[McManus' Deposition] at 45:12-25).

- Workplace shootings and workplace violence are of
extreme concern to FPS. (*Id.* at 48:20-49:21).

- Plaintiff had acted nervous and emotional at the
security checkpoint. (*Id.* at 51:5-14, 51:23-52:9).

- Plaintiff had gone to the 18th floor, where HSI was
located. (*Id.* at 51:15-21).

- The HSI duty agent, a fellow law enforcement officer,
"was very concerned" about Plaintiff's presence in the
building and wanted Plaintiff located and escorted
from the building. (*Id.* at 53:12-14, 54:3-12).

(*Id.* at PageID.96–97 (footnote omitted).) But Defendant does not

explain how McManus or any of the other agents relied on specific and

articulable facts that based on their training and experience led them to

reasonably suspect that Plaintiff was involved in criminal activity.

In Michigan,

for law enforcement officers to make a constitutionally
proper investigative stop, . . . . [t]he totality of the
circumstances as understood and interpreted by law
enforcement officers, not legal scholars, must yield a
particular suspicion that the individual being investigated

has been, is, or is about to be engaged in criminal activity.
That suspicion must be reasonable and articulable . . . .

*People v. Thorpe*, No. 297936, 2011 WL 5374965, at *4 (Mich. Ct. App.
Nov. 8, 2011) (quoting *People v. Nelson*, 443 Mich. 626, 632 (1993)). "An
officer's conclusion must be drawn from reasonable inferences based on
the facts in light of his training and experience." *People v. Cox*, No.
331151, 2017 WL 1967957, at *3 (Mich. Ct. App. May 11, 2017) (citing
*Terry*, 392 U.S. at 27). "Overly technical reviews of the police officer's
assessment are unwarranted, and '[d]eference should be given to the
police officer's experience and the known patterns of certain types of
lawbreakers.'" *People v. Ramirez*, No. 306316, 2013 WL 375911, at *2
(Mich. Ct. App. Jan. 31, 2013) (quoting *People v. Rizzo*, 243 Mich. App.
151, 156 (2000)).

"Reasonable suspicion is an objective standard." *People v.*
*Lambert*, No. 344788, 2019 WL 6248347, at *2 (Mich. Ct. App. Nov. 21,
2019) (citing *Terry*, 392 U.S. at 21–22). It "entails something more than
an inchoate or unparticularized suspicion or 'hunch,' but less than the
level of suspicion required for probable cause." *People v. Smith*, No.
349736, 2020 WL 6816505, at *2 (Mich. Ct. App. Nov. 19, 2020) (quoting
*People v. Champion*, 452 Mich. 92, 98 (1996)). "The officer 'must be able

to point to specific and articulable facts which, taken together with rational inferences from those facts,' would 'warrant a [person] of reasonable caution in the belief' that a crime was afoot." *Id.* (citing *Terry*, 392 U.S. at 21–22). "When determining reasonableness, the court must consider whether the facts known to the officer at the time of the stop would warrant an officer of reasonable caution to suspect criminal activity." *Cox*, 2017 WL 1967957, at *3 (citing *Terry*, 392 U.S. at 21–22). "[T]he 'collective knowledge,' or 'police team' doctrine, . . . permits law enforcement officers to develop reasonable suspicion based on facts relayed to them by other officers, as well as by their own, personal observations." *Baum v. Walsh*, No. 11-13318, 2012 WL 6096570, at *8 (E.D. Mich. Dec. 7, 2012) (citing *United States v. Hensley*, 469 U.S. 221, 232–33 (1985); *People v. Dixon*, 392 Mich. 691, 696–97 (1974) (*abrogated on other grounds by People v. Hawkins*, 468 Mich. 488 (2003))).

The FPS agents in this case do not articulate based on specific facts how they inferred that criminal activity was afoot when they stopped Plaintiff. Taking the facts in the light most favorable to Plaintiff, the agents lacked reasonable suspicion to conduct an investigative stop of Plaintiff on the first floor of the McNamara

Building. Defendant argues that one factor that provided the agents with reasonable suspicion was McManus' knowledge of HSI's concerns regarding Plaintiff—in particular, that "HSI had previously feared that Plaintiff might be armed with a firearm and might be capable of committing workplace violence at his former workplace." (ECF No. 20, PageID.96–97 (internal citation omitted).) However, Defendant does not show what specific facts the agents relied on to suspect that on March 23, 2015 Plaintiff was armed and likely to commit workplace violence at the McNamara Building. Plaintiff was screened for weapons at the security checkpoint before entering the building (*see* ECF No. 20-2, PageID.110; ECF No. 20-5, 00:12–00:22, 05:17–05:20, 05:25–05:35; ECF No. 20-7, PageID.140), and he was "clear." (ECF No. 20-5, 00:12–00:22.) When asked if he thought Plaintiff might have been carrying a hidden weapon, McManus testified that he was not "hypervigilant" that Plaintiff might have been armed, and McManus stated in general terms that "[i]t is possible for a person, an employee with . . . knowledge [of the building from working there], to perhaps bring things in and have them hidden." (ECF No. 20-13, PageID.202.) Thus, the record does not show that the agents relied on specific evidence from which they

reasonably inferred based on their training and experience that Plaintiff was armed and likely to commit workplace violence.

Further, Defendant provides no evidence that the agents perceived any kind of threat from Plaintiff on March 23, 2015. The agents do not point to specific facts indicating threatening behavior by Plaintiff that led them to believe that Plaintiff had committed, was committing, or was about to commit a crime. The PSOs "never indicated . . . at all" to McManus that Plaintiff seemed threatening (ECF No. 20-13, PageID.201), and Smith did not perceive from Plaintiff's conduct that he posed a threat. (*See* ECF No. 20-7, PageID.144.) Mendez testified that there was no radio communication indicating that Plaintiff posed a threat, and Mendez perceived no threat when he arrived at the business center and saw Plaintiff. (*See* ECF No. 20-10, PageID.167.) McManus agrees that Plaintiff did not threaten anybody and did not carry out a criminal act. (*See* ECF No. 20-13, PageID.203–205.)

McManus created the FPS Report one year before Plaintiff visited the McNamara Building to record "a possible threat" reported by Hayes, and McManus' investigation revealed that Plaintiff "allegedly made

81

statements that were possibly threatening to HSI" when Plaintiff was "observed in a local gun shop apparently shopping for firearms." (ECF No. 20-3, PageID.133.) HSI had "concerns for their safety" with Plaintiff. (ECF No. 20-13, PageID.198.) According to McManus, Hayes communicated to him that it was possible Plaintiff could be armed, that it was possible Plaintiff had expressed hostility toward HSI, and that Hayes was afraid Plaintiff could pose a threat to the building. (*See id.* at PageID.205.) But McManus was unaware of whether there was a concern about Plaintiff's psychological state, and he had "no information of a specific plan." (*Id.* at PageID.198.) Defendant does not show how this general information about a possible threat reported in 2014 gave the agents reason to suspect that criminal activity was imminent, ongoing, or had already taken place when they stopped Plaintiff on the first floor of the McNamara Building on March 23, 2015.

Defendant next argues that the agents had reasonable suspicion to stop Plaintiff because McManus knew that Plaintiff was a former law enforcement officer who was trained in weapons and self-defense tactics. (*See* ECF No. 20, PageID.96 (internal citation omitted).) But McManus' testimony does not show that this knowledge led McManus

82

or the other agents to believe that criminal activity was afoot. McManus testified that it was "possible for a person" or a former employee or former agent like Plaintiff "to perhaps bring [hidden] things in" the building and that McManus was "[p]robably not" "hypervigilant that [Plaintiff] might have a weapon." (ECF No. 20-13, PageID.202.) McManus "wasn't sure what [Plaintiff] was capable of," and he was not aware that Plaintiff had "peculiar or unusual physical abilities," but he believes that a law enforcement officer can do more damage than a member of the public and that any person "can do a lot of damage with just hands." (*Id.* at PageID.206–207.) Even giving deference to McManus' knowledge and experience as a law enforcement officer, this testimony provides no basis to conclude that McManus or the other agents reasonably suspected that Plaintiff had engaged in, was engaging in, or was about to engage in criminal activity.

Defendant argues that another factor that contributes to the existence of reasonable suspicion is that McManus knew that "[w]orkplace shootings and workplace violence are of extreme concern to FPS." (ECF No. 20, PageID.97 (internal citation omitted).) But the agents do not articulate in their testimony what specific facts led them

to suspect based on their training and experience that a workplace shooting or workplace violence was afoot when Plaintiff was in the building. Plaintiff passed the screening checkpoint like any other member of the public (*see* ECF No. 20-2, PageID.110; ECF No. 20-5, 00:12–00:22), and the FPS Alert involving him had expired. (*See* ECF No. 20-4, PageID.134.) Plaintiff testified that he told the screener that he was going to the Senator's office and that he disagreed with the screener when the screener said Plaintiff was there to visit his former coworkers. (*See* ECF No. 20-2, PageID.110–112.) Plaintiff also told the FPS agents that his only reason for being in the building was to go to the Senator's office (*see id.* at PageID.110–112, 117–118, 124) and that he never intended to see "any ICE employees" or "anyone from the agency." (*Id.* at PageID.124.) There is no indication that on March 23, 2015 the agents had any knowledge of Plaintiff's psychological state or believed that Plaintiff possessed a weapon. (ECF No. 20-2, PageID.117; ECF No. 20-13, PageID.198, 206.) Moreover, McManus was aware of concerns of violence related to Plaintiff, but he had "no information of a specific plan." (ECF No. 20-13, PageID.198.) Without specific facts

pointing to criminal activity, Defendant does not show that the agents had reasonable suspicion to stop Plaintiff.

Regarding Defendant's argument that the agents had reasonable suspicion to stop Plaintiff because McManus knew that Plaintiff had acted nervous and emotional at the security checkpoint (*see* ECF No. 20, PageID.97 (internal citation omitted)), Wilson reported to McManus that Plaintiff was emotional, and this information made McManus "suspect" that Plaintiff "was troubled." (ECF No. 20-13, PageID.201.) McManus testified that being emotional is "somewhat unusual." (*Id.*) In addition, Hollis told McManus that Plaintiff seemed nervous. (*See id.*; ECF No. 20-3, PageID.130.) McManus testified that for Hollis to mention Plaintiff's nervousness to him "means that it was out of the ordinary" (ECF No. 20-13, PageID.201) and was "an elevated level of nervousness" because the PSOs have worked the public entrance "for years," so "[t]hey know what normal is." (*Id.* at PageID.206.) McManus also found it "[v]ery odd" and "out of the ordinary" that Plaintiff unnecessarily displayed his identification several times when going through security. (*Id.* at PageID.201.) But "behavior that merely is 'unusual' or 'out of the ordinary' does not necessarily support a finding

of reasonable suspicion." *People v. Malone*, No. 329989, 2016 WL 5853288, at *8 (Mich. Ct. App. Oct. 4, 2016) (citing *United States v. Townsend*, 305 F.3d 537, 541–45 (6th Cir. 2002)). And "[e]ven assuming that [Plaintiff's] behavior . . . is 'unusual' or constitutes 'nervousness,' at no point do[] [Defendant or the FPS agents] explain how [Plaintiff's] behavior contributed to the reasonable suspicion that [he] was 'engaged in, or poised to commit, a criminal act at that moment.'" *Id.* (quoting *Sokolow*, 490 U.S. at 12 (Marshall, J., dissenting); citing *Brown v. Texas*, 443 U.S. 47, 51 (1979)); *see People v. Kavanaugh*, 320 Mich. App. 293, 305–06 (2017) (rejecting the officer's "proposition that [an individual leaving the door open when he sat inside the police car with the officer] served as grounds to support reasonable suspicion" because the officer "described this as unusual" but "failed to articulate any basis for the conclusion that this was suspicious behavior or that in his experience it indicated criminal activity").

With respect to Plaintiff's nervousness, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Oliver*, 464 Mich. at 197 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). But it is generally "an unreliable indicator [of illegal activity]." *Malone*,

2016 WL 5853288, at *8 (quoting *United States v. Richardson*, 385 F.3d 625, 630–31 (6th Cir. 2004); citing *United States v. Simpson*, 609 F.3d 1140, 1148 (10th Cir. 2010)). In the context of a traffic stop, for example, "many courts have given little weight to considerations of nervousness," *People v. Hannigan*, No. 339239, 2018 WL 1073204, at *5 (Mich. Ct. App. Feb. 27, 2018) (quoting *Kavanaugh*, 320 Mich. App. at 304), because "many citizens become nervous when stopped by the police 'even when they have nothing to hide or fear.'" *Malone*, 2016 WL 5853288, at *8 (quoting *Richardson*, 385 F.3d at 630–31; citing *Simpson*, 609 F.3d at 1148). In addition, "unless an officer has prior knowledge of a person, 'it is difficult, even for a skilled police officer, to evaluate whether a person is acting normally for them or nervously.'" *Id.* (quoting *Simpson*, 609 F.3d at 1148). "Extreme and persistent nervousness is generally entitled to more weight than general nervousness, . . . and a review[ing] court typically 'examines specific indicia that the [individual's] nervousness was extreme [such as increasing loss of color in the face, a cracking voice, shaking hands, quivering lips, swallowing hard, twitching movements, or a rigid

posture], rather than credit an officer's naked assertion.'" *Id.* (internal citations omitted) (quoting *Simpson*, 609 F.3d 1148).

Here, McManus recognizes that many people are nervous when they go through screening (*see* ECF No. 20-13, PageID.201, 206), and he relied on Hollis' general observations, which lack specific indications of nervousness and are not based on a prior knowledge of Plaintiff, to conclude that Plaintiff's nervousness was extreme. McManus does not explain how these general observations and Hollis' perception of Plaintiff were an indicator of criminal activity such that the FPS agents had reasonable suspicion to stop Plaintiff. Nor does McManus articulate how his own training and experience as a law enforcement officer led to such a determination.

Defendant argues that the agents also had reasonable suspicion because McManus knew that "Plaintiff had gone to the 18th floor, where HSI was located." (ECF No. 20, PageID.97 (internal citation omitted).) But McManus' explanation for why this was a concern—"[b]ecause I knew he wasn't supposed to be up there" and "[t]hey wanted nothing to do with him" (ECF No. 20-13, PageID.206)—does not articulate a reasonable suspicion of criminal activity. Moreover, from

88

the moment Plaintiff went through the security checkpoint to the moment right before he exited the building, Plaintiff consistently communicated that he had no intention of going to HSI's office. Plaintiff testified that before entering the building he told the PSO that he was going to the Senator's office and not HSI's office. (*See* ECF No. 20-2, PageID.110–112.) Plaintiff also told the FPS agent on the eighteenth floor that the Senator's office was "the only place" he wanted to visit, and Plaintiff agreed not to speak to "ICE personnel." (*Id.* at PageID.110.) On the first floor, which is where the building's exit—not HSI's offices—are located (*see* ECF No. 20-13, PageID.202–203), Plaintiff told the FPS agents that he wanted to leave because he was done with his business at the Senator's office. (*See* ECF No. 20-2, PageID.111.) In the business center, Plaintiff informed the FPS agents that "he was in the building to go to the Senator's office and at no time did he want to go to the HSI office" or see anyone from HSI. (ECF No. 20-3, PageID.130-131; *see* ECF No. 20-2, PageID.124.) Defendant does not articulate how the agents relied on specific facts and their law enforcement training and experience to conclude that Plaintiff, who did

not visit HSI's office and stated multiple times that he had no intention of going there, was involved in criminal activity.

Defendant further argues that the reasonable suspicion standard is met because McManus knew that Hayes, "[t]he HSI duty agent, [and] a fellow law enforcement officer, 'was very concerned' about Plaintiff's presence in the building and wanted Plaintiff located and escorted from the building."[35] (ECF No. 20, PageID.97 (internal citations omitted).) Hayes' request to locate and escort Plaintiff was not based on Plaintiff's behavior on March 23, 2015; rather, McManus indicates that Hayes made this request "based upon their information and their experience with [Plaintiff] in the year prior, before he left." (ECF No. 20-13, PageID.202.) McManus testified that he found Hayes' concern significant because "law enforcement personnel encounter people with all kinds of demeanors" and "don't get concerned easily," so "[t]here has to be some kind of basis for that feeling." (*Id.* at PageID.207.) But this

---

[35] Defendant states in its brief that after the HSI duty agent "asked that Plaintiff be located and escorted out of the building[,] . . . Bowers then called the MegaCenter and requested that FPS conduct a sweep to find Plaintiff (which in this context would necessarily result in Plaintiff being stopped and questioned)." (ECF No. 20, PageID.96 (internal citations omitted).) However, Defendant does not explain why, or under what authority, a sweep "in this context would necessarily result in Plaintiff being stopped and questioned."

concern, which McManus refers to as a "feeling," is closer to a "hunch" than an articulation of a specific inference of imminent criminal activity, and "the constitutional requirement is clear. A hunch is not enough." *Kavanaugh*, 320 Mich. App. at 307 (citing *Terry*, 392 U.S. at 27).

Defendant argues that Plaintiff's encounter with the FPS agents "never became an arrest." (ECF No. 20, PageID.97.) Plaintiff does not respond to this argument. Even if the Court credits Defendant's argument and treats the encounter on the first floor between Plaintiff and the FPS agents as a *Terry* stop, Defendant has not shown that based on the totality of the circumstances the encounter was a lawful investigative stop for which the FPS agents had reasonable suspicion to stop Plaintiff, as discussed above. However, Plaintiff's interaction with an FPS agent on the eighteenth floor was a consensual encounter for which no level of suspicion was required.

Accordingly, Defendant's summary judgment motion is GRANTED as to Plaintiff's claims of false arrest (Count I) and false imprisonment (Count II) with respect to Plaintiff's encounter with the FPS agent on the eighteenth floor, but the motion is DENIED as to

these claims with respect to Plaintiff's encounter with the FPS agents on the first floor, subject to the discussion on governmental immunity that appears below in Subsection C.

## B. Intentional Infliction of Emotional Distress Claim (Count III)

In Plaintiff's intentional infliction of emotional distress claim in Count III of the complaint, he alleges that "Defendant's agents intentionally, willfully and recklessly breached" certain duties they owed Plaintiff[36] by "a. Intentionally inflicting emotional distress upon Plaintiff forcing him to experience unwarranted treatment, humiliation, and embarrassment; b. Intentionally falsely arresting Plaintiff; c. Intentionally falsely imprisoning Plaintiff; d. Intentionally treating Plaintiff, a good standing member of society, in an aggressive and

---

[36] Plaintiff alleges that

Defendant's agents owed Plaintiff the following duties:

    a. To refrain from the [sic] intentionally inflicting emotional distress upon Plaintiff;

    b. To refrain from falsely arresting Plaintiff;

    c. To refrain from falsely imprisoning Plaintiff;

    d. To refrain from treating Plaintiff, a good standing member of society, in an aggressive and abusive manner.

(ECF No. 1, PageID.4.)

abusive manner." (ECF No. 1, PageID.4.) Plaintiff alleges that "[a]s a factual and proximate cause of said intentional, willful and reckless breach, Plaintiff suffered serious and perm[an]e[]nt injuries to his mind, mental anguish, pain and suffering, loss of enjoyment of life, humiliation." (*Id.* at PageID.5.) Defendant argues that this claim "fails because [Plaintiff] cannot satisfy any of [its] elements," particularly the elements regarding extreme and outrageous conduct, intent or recklessness, and severe emotional distress. (ECF No. 20, PageID.101; ECF No. 23, PageID.370.)

"To establish . . . a[n] [intentional infliction of emotional distress] claim, Plaintiff must demonstrate (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Szappan v. Meder*, No. 18-cv-12244, 2019 WL 108842, at *9 (E.D. Mich. Jan. 4, 2019) (citing *Roberts v. Auto Owners Ins. Co.*, 422 Mich. 594 (1985); *Hayley v. Allstate Ins. Co.*, 262 Mich. App. 571 (2004)). In Michigan,

> "[l]iability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Doe v. Mills*, 212 Mich. App. 73, 91, 536 N.W.2d 824 (1995). "The test to determine whether a person's conduct was extreme and outrageous is whether recitation of the facts of

the case to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Lewis v. LeGrow*, 258 Mich. App. 175, 196, 670 N.W.2d 675 (2003) (quotation marks and citation omitted). This test is a demanding one. Indeed, the necessary threshold for establishing that conduct is extreme and outrageous has been described as "formidable." *Atkinson v. Farley*, 171 Mich. App. 784, 789, 431 N.W.2d 95 (1988).

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. [*Id.* (quotation marks and citation omitted).]

*Martin v. Smith*, No. 354128, 2020 WL 7310960, at *5 (Mich. Ct. App. Dec. 10, 2020) (footnote omitted). "This is therefore an objective test, independent of plaintiff's personal feelings on the matter." *Sourander v. Cnty. of Ogemaw*, No. 350632, 2020 WL 6375206, at *10 (Mich. Ct. App. Oct. 29, 2020).

"[A] plaintiff will only be able to recover for intentional infliction of emotional distress 'in the most egregious of cases.'" *Watkins v. City of Southfield*, 221 F.3d 883, 890 (6th Cir. 2000) (quoting *Bonelli v. Volkswagen of Am., Inc.*, 166 Mich. App. 483, 421 (1988)). "In reviewing a claim for intentional infliction of emotional distress, 'it is initially for the court to determine whether the defendant's conduct reasonably may be regarded as so extreme and outrageous as to permit recovery.'" *Moore v. Moore*, No. 343266, 2019 WL 3315360, at *8 (Mich. Ct. App. July 23, 2019) (quoting *Mills*, 212 Mich. App. at 92), *appeal denied*, 505 Mich. 1017 (2020). "Where reasonable minds may differ as to that question, however, it should be left for the jury." *Id.* (citing *Mills*, 212 Mich. App. at 92). "With regard to the second element, intent or recklessness, a plaintiff must show either that a defendant specifically intended to cause the plaintiff emotional distress or that the defendant's conduct was so reckless that 'any reasonable person would know emotional distress would result.'" *Yesner v. Borgess Med. Ctr., Inc.*, No. 324516, 2016 WL 930744, at *1 (Mich. Ct. App. Mar. 10, 2016) (quoting *Lewis*, 258 Mich. App. at 197).

In this case, Plaintiff's intentional infliction of emotional distress claim fails because he does not show that the FPS agents' conduct was extreme and outrageous. Plaintiff argues in his response to Defendant's motion that the agents' conduct was extreme and outrageous, and that therefore this element is satisfied, "because they falsely arrested and imprisoned" Plaintiff. (ECF No. 22, PageID.227.) Plaintiff asserts, without citing to any legal authority, that "[f]alse arrest and imprisonment, clear violations of the [F]ourth [A]mendment, are extreme and outrageous acts because they are an unlawful intrusion by a government agent." (*Id.*)

Plaintiff's arguments lack merit. His claim is unsuccessful because he does not make the necessary showing of egregious conduct by the FPS agents. In other words, he does not show that their conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Martin*, 2020 WL 7310960, at *5 (internal citation omitted). In *Szappan v. Meder*, the court dismissed a claim of intentional infliction of emotional distress because "[a]lthough th[e] action [taken by the officer] was a constitutional violation, it did

not exceed all bounds of common decency nor was it so atrocious as to be utterly intolerable in a civilized society." *Szappan*, 2019 WL 108842, at *9 (citing *Roberts*, 422 Mich. at 603). As a result, a constitutional violation, on its own, is insufficient to demonstrate that conduct is extreme and outrageous for purposes of bringing a claim of intentional infliction of emotional distress. Here, no reasonable jury would find that the FPS agents' conduct was extreme and outrageous based on Plaintiff's assertion that the conduct was unlawful. Plaintiff's failure to satisfy this first element entitles Defendant to summary judgment on his intentional infliction of emotional distress claim. *See Boyd v. McCabe*, No. 16-cv-12741, 2020 WL 1502002, at *12 (E.D. Mich. Mar. 30, 2020) (granting summary judgment to the defendants on the plaintiff's intentional infliction of emotional distress claims solely because "[t]he Court doubts very much that any reasonable juror would find that [the defendants'] conduct was 'beyond all possible bounds of decency' and 'utterly intolerable in a civilized community'").

In addition to Plaintiff's failure to demonstrate extreme and outrageous conduct, his intentional infliction of emotional distress claim does not survive summary judgment for a separate reason: because, as

97

Defendant points out, "Plaintiff has offered no evidence that the agents acted with specific intent to cause him emotional distress." (ECF No. 20, PageID.101.) Plaintiff argues in his response to Defendant's motion that intent or recklessness is shown because the FPS agents "were aware that [Plaintiff] was emotional" and "either knew or should have known that [Plaintiff] was under stress regarding his EEOC complaint, alleged whistleblower reprisal, and his denial of benefits." (ECF No. 22, PageID.227.) Plaintiff argues that "at the very least, Defendant's agents were reckless in falsely arresting and imprisoning a man who clearly has mental issues." (*Id.*)

Plaintiff testified, however, that the FPS agents were not trying to humiliate him (*see* ECF No. 20-2, PageID.121) and that they had no reason to retaliate against him. (*See id.* at PageID.120.) Moreover, Plaintiff is unaware of the agents having knowledge on March 23, 2015 that he was receiving mental health treatment at that time (*see id.* at PageID.117), and Plaintiff does not recall telling the agents that he was experiencing mental pain. (*See id.* at PageID.122.) McManus had no knowledge of Plaintiff's psychological state (*see* ECF No. 20-13, PageID.198, 206), and the agents testified that Plaintiff did not

complain about how he was treated. (*See* ECF No. 20-7, PageID.148; ECF No. 20-10, PageID.171; ECF No. 20-13, PageID.208.) Smith testified that no one in the business center, including Plaintiff, seemed upset. (*See* ECF No. 20-7, PageID.147–148.) McManus thought Plaintiff seemed upset but that he was upset about losing his job. (*See* ECF No. 20-13, PageID.207–208.) The agents did not draw their weapons, handcuff Plaintiff, or raise their voices in speaking with him. (*See* ECF No. 20-2, PageID.121; ECF No. 20-7, PageID.147–148; ECF No. 20-10, PageID.170; ECF No. 20-11, PageID.181; ECF No. 20-13, PageID.207–208.) Bowers testified that he decided to speak with Plaintiff in the business center "for [Plaintiff's] benefit" because Bowers did not "want to do anything that is going to embarrass him." (ECF No. 20-11, PageID.180.) At the end of their conversation, the agents thanked Plaintiff for his time. (*See* ECF No. 20-3, PageID.131.) Based on this record, a reasonable jury would not be able to conclude that the second element of Plaintiff's intentional infliction of emotional distress claim is met because the jury would not find that the FPS agents "specifically intended to cause . . . [P]laintiff emotional distress" or that their "conduct was so reckless that any reasonable person would know

emotional distress would result." *Yesner*, 2016 WL 930744, at *1 (internal quotation marks omitted).

Accordingly, Defendant's summary judgment motion is GRANTED as to Plaintiff's intentional infliction of emotional distress claim (Count III).

## C. Governmental Immunity

Defendant argues that it is entitled to Michigan governmental immunity on Plaintiff's intentional tort claims. (*See* ECF No. 20, PageID.101–104.) Plaintiff opposes this argument. (*See* ECF No. 22, PageID.228–229.) The Court finds that governmental immunity applies and protects Defendant from liability on Plaintiff's claims. At this point, Plaintiff's remaining claims are false arrest (Count I) and false imprisonment (Count II) with respect to Plaintiff's encounter with the FPS agents on the first floor.

In an FTCA case, Michigan governmental immunity shields the United States from intentional torts that a governmental employee would have had immunity from under state law. *See Valdez*, 58 F. Supp. 3d at 829 (indicating that "[t]he United States is entitled to the same Michigan governmental immunity from intentional torts that [a

federal agent] would have had under state law"). The Sixth Circuit recently stated that

> state-law immunity under Michigan law . . . requires that [the governmental employee] demonstrate: (1) the challenged acts were undertaken during the course of his employment and that he was acting, or reasonably believed that he was acting, within the scope of his authority; (2) the acts were undertaken in good faith and; (3) the acts were discretionary, as opposed to ministerial. *Odom v. Wayne County*, 482 Mich. 459, 480, 760 N.W.2d 217 (2008).

*Richards v. Cnty. of Washtenaw*, 818 F. App'x 487, 494 (6th Cir. 2020) (alteration added). "[G]overnmental immunity is an affirmative defense," and the governmental employee "carr[ies] the burden to raise and establish governmental immunity by showing" these three requirements are met. *Peterson v. Heymes*, 931 F.3d 546, 557 (6th Cir. 2019).

In this case, Defendant argues that it makes the requisite showing because "the actions taken by the FPS agents were in the course of their employment . . . and were discretionary." (ECF No. 20, PageID.103.) Moreover, "[t]he remaining element" regarding good faith is "undisputed" in Defendant's view "given the testimony from both sides," which Defendant states does not show bad faith, malice, or a motive for

acting out of malice. (*Id.* at PageID.103–104.) Only the showing of good faith is in dispute. In other words, the parties disagree as to "whether a jury could reasonably find [that the FPS agents] did not act in good faith." *Richards v. City of Jackson, Mich.*, 788 F. App'x 324, 336 (6th Cir. 2019).

"The good-faith requirement 'imposes a subjective test for governmental immunity for intentional torts, based on the officials' state of mind . . . .'" *Id.* (quoting *Brown v. Lewis*, 779 F.3d 401, 420 (6th Cir. 2015); citing *Odom*, 482 Mich. at 481–82). It "protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." *Fineout v. Kostanko*, 780 F. App'x 317, 330 (6th Cir. 2019) (quoting *Odom*, 482 Mich. at 482). "Under Michigan law, good faith is defined 'simply as acting without malice.'" *Id.* (quoting *Odom*, 482 Mich. at 474). "Lack of good faith is defined as 'malicious intent, capricious action or corrupt conduct' or 'willful and corrupt misconduct.'" *Godboldo v. Cnty. of Wayne*, 686 F. App'x 335, 344 (6th Cir. 2017) (quoting *Odom*, 482 Mich. at 474). "Specifically, 'willful and wanton misconduct is made out only if the conduct alleged shows an intent to harm or, if not that, such

indifference to whether harm will result as to be the equivalent of willingness that it does.'" *Id.* (quoting *Odom*, 482 Mich. at 474). Therefore, "[a] governmental employee fails the 'good faith' standard under the second prong when they act maliciously, recklessly, capriciously, or willfully and corruptly." *Peterson*, 931 F.3d at 557 (citing *Odom*, 482 Mich. at 472–74).

Here, a reasonable jury viewing the evidence in a light most favorable to Plaintiff would not be able to conclude that the FPS agents acted in bad faith. Plaintiff testified that prior to March 23, 2015, he never had a problem with the agents (*see* ECF No. 20-2, PageID.113) and that the extent of their relationship was that they would greet each other on the elevator. (*See id.* at PageID.121.) Plaintiff had "no indication" before March 23 that the agents knew about his history with DHS or about any "disagreement" between him and the agency. (*Id.* at PageID.113–114, 120.) In addition, he has "no knowledge" that they knew he was receiving mental health treatment (*id.* at PageID.117), and Plaintiff does not recall telling the agents that their encounter caused him to suffer mental pain. (*See id.* at PageID.122.) On March 23, the agents did not handcuff Plaintiff, and Plaintiff perceived that they

were trying to intimidate him but not humiliate him. (*See id.* at PageID.121.) Moreover, Plaintiff believes that none of the agents had a personal reason to retaliate against him. (*See id.* at PageID.120.) Plaintiff testified about "reprisal" or "retaliation" (*id.* at PageID.111, 119, 120, 125), but he states that those responsible for it are "the ICE office, of investigations, or the senior management there that day," and Hayes. (*Id.* at PageID.113, 120.) According to Plaintiff, they "used the FPS in order to harass me, and effect whistleblower reprisal, for my EEO complaints . . . ." (*Id.* at PageID.113.)

The FPS agents' testimony does not support the conclusion that they acted in bad faith. McManus investigated Plaintiff's presence in the building due to information he had received from HSI about Plaintiff (*see* ECF No. 20-13, PageID.206) and based on his conversations with the PSOs. (*See id.* at PageID.201, 206.) The other agents searched for Plaintiff because they were dispatched by the MegaCenter to locate him. (*See* ECF No. 20-3, PageID.130; ECF No. 20-6, 00:24–00:38; ECF No. 20-7, PageID.146; ECF No. 20-10, PageID.166; ECF No. 20-13, PageID.202.) The agents had limited knowledge about Plaintiff and did not know the specifics of his position or the details of

his termination. (*See* ECF No. 20-7, PageID.146; ECF No. 20-10, PageID.166, 169; ECF No. 20-11, PageID.182; ECF No. 20-13, PageID.195–196, 206.) The agents did not know Plaintiff personally, and only McManus was aware of the FPS Alert related to Plaintiff because he created it. (*See* ECF No. 20-4, PageID.134; ECF No. 20-7, PageID.141; ECF No. 20-10, PageID.166, 169; ECF No. 20-11, PageID.179; ECF No. 20-13, PageID.196–199.)

Bowers testified that the move from the hallway to the business center was "for [Plaintiff's] benefit" because Bowers thought it would be less embarrassing for Plaintiff to speak with the agents in the business center, a public space that was more private than the hallway. (ECF No. 20-11, PageID.180–181; *see* ECF No. 20-7, PageID.147; ECF No. 20-10, PageID.170.) From the agents' perspective, Plaintiff was free to leave at all times (*see* ECF No. 20-7, PageID.147; ECF No. 20-10, PageID.170–171; ECF No. 20-13, PageID.203, 207), he was not detained or arrested (*see* ECF No. 20-10, PageID.170; ECF No. 20-11, PageID.181; ECF No. 20-13, PageID.203, 207), and what took place inside the business center was a "casual encounter," a "casual conversation," and "just normal conversation." (ECF No. 20-10,

PageID.169; ECF No. 20-11, PageID.181; ECF No. 20-13, PageID.203–204.) Smith testified that he thought Plaintiff "was just a member of the public on that day." (ECF No. 20-7, PageID.145.) The agents did not restrain or handcuff Plaintiff, raise their voices, draw their weapons, or act aggressively, abusively, or impolitely toward him. (*See* ECF No. 20-7, PageID.147–148; ECF No. 20-10, PageID.169–170; ECF No. 20-11, PageID.181; ECF No. 20-13, PageID.207–208.) Mendez described Smith's demeanor as "[v]ery calm, cool" (ECF No. 20-10, PageID.169), and Bowers described it as "very casual." (ECF No. 20-11, PageID.181.)

In addition, McManus knew nothing about Plaintiff's psychological state. (*See* ECF No. 20-13, PageID.198, 205–206.) The agents testified that Plaintiff did not seem injured, and he did not complain or ask them to stop what they were doing. (*See* ECF No. 20-7, PageID.147–148; ECF No. 20-10, PageID.171; ECF No. 20-13, PageID.208.) Smith did not perceive Plaintiff to be upset. (*See* ECF No. 20-7, PageID.147–148.) McManus did find that Plaintiff was upset, but it was about losing his position, and McManus felt sorry for him. (*See* ECF No. 20-13, PageID.207.) Bowers did not find Plaintiff to be emotional (*see* ECF No. 20-11, PageID.180), but McManus did, which

also made him feel sorry for Plaintiff. (*See* ECF No. 20-13, PageID.207.) Plaintiff seeming emotional and nervous at the security checkpoint were "red flags" that made McManus investigate Plaintiff's presence in the building. (ECF No. 20-13, PageID.201.) Based on this evidence and viewing the situation as a whole, a reasonable jury would not be able to conclude that the agents acted maliciously when they interacted with Plaintiff because their conduct does not show "an intent to harm" or "such indifference to whether harm will result as to be the equivalent of willingness that it does." *Godboldo*, 686 F. App'x at 344 (internal quotation marks and citation omitted).

Plaintiff argues that the FPS agents

were not in good faith because the agents acted upon an expired FPS alert, and because they were told to treat him like a member of the public. Exhibit C.[37] Considering the agent's [sic] knowledge of the prior facts, there is a genuine

---

[37] Plaintiff identifies "Exhibit C" in his "Index of Exhibits" as "Audio Recording, Defendant's Exhibits 4, 5, 7, 8." (ECF No. 22, PageID.231.) Defendant's Exhibit 4 is an audio recording that is 6:26 minutes long; Exhibit 5 is 2:53 minutes long; Exhibit 7 is 1:03 minutes long; and Exhibit 8 is 38 seconds long. Altogether these four exhibits are approximately eleven minutes long. Plaintiff does not point to what portion of these audio recordings he relies on to support his position, and "it is not for the court to search the record and construct arguments. Parties must do that for themselves." *Brenay v. Schartow*, 709 F. App'x 331, 337 (6th Cir. 2017) (citing *Magnum Towing & Recovery v. City of Toledo*, 287 F. App'x 442, 449 (6th Cir. 2008)).

> issue of material fact as to whether Defendant acted in good
> faith according to *Odom*.

(ECF No. 22, PageID.229.) Plaintiff does not specify what "prior facts"

the agents had knowledge of that raise a question of fact as to whether

they acted in good faith or where in the record the "prior facts" appear.

Plaintiff's argument fails to show that the agents acted with

malicious intent. McManus testified that even though the FPS Alert

had expired, "the concern for [Plaintiff's] behavior had not" and Plaintiff

"did pose a threat a year earlier." (ECF No. 20-13, PageID.203, 205.)

This was McManus' honest belief, and there is no evidence to support a

finding that he or the other agents subjectively acted in bad faith.

Moreover, the FPS agents did not act solely based on the FPS Alert, as

Plaintiff contends; rather, they located Plaintiff due to the

MegaCenter's communication dispatching them to find him. (*See* ECF

No. 20-3, PageID.130; ECF No. 20-6, 00:24–00:38; ECF No. 20-7,

PageID.146; ECF No. 20-10, PageID.166; ECF No. 20-13, PageID.202.)

This communication was issued after McManus visited HSI's office and

Hayes asked that Plaintiff be located and escorted from the building

based on HSI's information and experience with Plaintiff from the

previous year. (*See* ECF No. 20-3, PageID.130; ECF No. 20-13,

PageID.202, 207.) Prior to that communication, McManus investigated Plaintiff's presence in the building because of HSI's and his own concerns about Plaintiff, and McManus never told anyone to "apprehend" Plaintiff. (ECF No. 20-13, PageID.206.) Mendez, who did not know about the FPS Alert (*see* ECF No. 20-10, PageID.169), "took it upon [him]self" to join Smith in the business center "to back him up"; he was not instructed to go to the first floor. (*Id.* at PageID.166–167.) McManus was called to the business center by Bowers and also went there to support his coworkers. (*See* ECF No. 20-3, PageID.130; ECF No. 20-13, PageID.203.) The agents indicate that it is standard law enforcement policy or procedure to have more than one officer present when speaking with an individual in this type of situation. (*See* ECF No. 20-10, PageID.170; ECF No. 20-13, PageID.205.)

Regarding Plaintiff's claim that the agents were told to treat Plaintiff like a member of the public, Plaintiff does not specify where this instruction came from, *see supra* note 37, but Smith states that this is exactly what Plaintiff was on that day. (*See* ECF No. 20-7, PageID.145.) To the extent Plaintiff meant to argue that the agents acted maliciously because he believes they lacked probable cause, the

Sixth Circuit has stated that "[t]he absence of probable cause does not automatically lead to malice." *Rudolph v. Babinec*, 939 F.3d 742, 753 (6th Cir. 2019).

Plaintiff also argues that the Court "should not consider governmental immunity at this stage" because under *McGuire v. Warner*, "a genuine issue of material fact exists [in this case] as to whether Defendant's agents acted in good faith according to *Odom*." (ECF No. 22, PageID.228–229 (citing *McGuire v. Warner*, No. 05-40185, 2009 WL 2423182 (E.D. Mich. Aug. 3, 2009).) Plaintiff states that in *McGuire*, the court

> determine[d] that it could not grant summary judgment in favor of the defendant based on governmental immunity, because the plaintiff's tort claims in that case had survived the FRCP Rule 56 standard. The court found that because there was a genuine issue of material fact as to whether the defendants had committed negligent and intentional torts against Plaintiff, there, likewise, was a genuine issue of material fact as to whether Defendants had acted in good faith.

(*Id.* at PageID.229 (footnote omitted).)

However, the court in *McGuire* "conclude[d] that Defendants are not entitled to summary judgment on the issue of governmental immunity" because "issues of fact preclude such a ruling." *McGuire*,

110

2009 WL 2423182, at *4. Specifically, the court determined that there were questions of fact with respect to gross negligence and good faith. Regarding gross negligence, the court noted that the Sixth Circuit, in affirming its "denial of Defendants' summary judgment motion as to governmental immunity," found that "there is a genuine issue of material fact as to whether [the defendants] acted with gross negligence." *Id.* (emphasis omitted). The district court then made a separate finding "that, when the evidence is viewed in the light most favorable to Plaintiffs, there is a genuine issue of fact as to whether Defendants' actions were taken in good faith." *Id.* Plaintiff's interpretation of *McGuire* does not provide a basis for denying Defendant's request for governmental immunity because in this case there is no issue of fact as to whether the FPS agents acted in good faith.

In sum, Defendant has provided evidence that the agents subjectively acted in good faith, and Plaintiff's arguments do not raise a question of material fact with respect to the agents' state of mind and whether they acted with malice. Accordingly, Defendant is entitled to Michigan governmental immunity on Plaintiff's intentional tort claims.

*See Ouza v. City of Dearborn Heights, Mich.*, 969 F.3d 265, 284 n.7 (6th Cir. 2020) (affirming the dismissal of the plaintiff's state law false arrest claim against an officer because the officer is entitled to Michigan governmental immunity and the plaintiff "has not demonstrated any genuine factual dispute as to [the officer's] '"malicious intent, capricious action or corrupt conduct" or "willful and corrupt misconduct"'" (quoting *Odom*, 482 Mich. at 474)). Governmental immunity shields Defendant from liability on Plaintiff's remaining claims: false arrest (Count I) and false imprisonment (Count II) with respect to Plaintiff's encounter with the FPS agents on the first floor of the McNamara Building.

## IV.   Conclusion

For the reasons set forth above, the Court GRANTS Defendant's motion for summary judgment (ECF No. 20).

IT IS SO ORDERED.

Dated: July 20, 2021         s/Judith E. Levy
Ann Arbor, Michigan       JUDITH E. LEVY
                                       United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 20, 2021.

<u>s/William Barkholz</u>
WILLIAM BARKHOLZ
Case Manager